St. Louis, Iron Mountain & Southern Railway

Company *v.* Hempfling.

## Opinion delivered March 31, 1913.

1. Master and servant—assumed risk—negligence of master.—A railroad brakeman who was killed because of the negligence of the railroad company in failing to furnish grab irons and handholds, which were necessary for the proper protection of the brakeman in the discharge of his duties, will not be held to have assumed the risk of the employment, because such negligence was not one of the ordinary risks of his employment.   (Page 482.)

2. Master and servant—duty to furnish safe appliances.—The absence of grab-irons and hand-holds from a freight car is not an open and obvious defect of which a brakeman must take notice. The brakeman had a right to assume that the company had not been negligent in providing safe appliances for his work.   (Page 483.)

3. Master and servant—injury to servant—sufficiency of evidence.—Where the proof shows that two freight cars were not properly equipped with grab-irons and hand-holds, and that deceased, a brakeman, fell between the cars and was killed, while attempting to cross from one car to the other, the evidence will be held sufficient to warrant the jury in concluding that deceased's death was caused by failure of the railroad company to provide proper grab-irons and hand-holds on the ends of the two cars between which he fell when attempting to cross from one to the other.   (Page 483.)

4. Evidence—master and servant—injury to servant—circumstances.—In an action against a railroad company for negligent killing, where there is no eye-witness to the injury and the cause thereof is not established by affirmative or direct proof, if the facts established by the circumstances will justify an inference that the negligent condition alleged produced the injury, the jury

are not left to the domain of speculation, but have circumstances upon which, as reasonable minds, they may ground their conclusions. (Page 484.)

5. NEGLIGENCE—PROXIMATE CAUSE—CIRCUMSTANTIAL EVIDENCE.—Negligence that is the proximate cause of an injury, may be shown by circumstantial evidence as well as by direct evidence. (Page 485.)

Appeal from Sebastian Circuit Court, Fort Smith District; *Daniel Hon,* Judge; affirmed.

### STATEMENT BY THE COURT.

Louis Hempfling was a brakeman in the employ of appellant. On the night of the 22d of January, 1912, about 10 o'clock he left Argenta on a freight train consisting of coal cars and a caboose, going west to Spadra. After opening the switch, while in the discharge of his duty, he boarded the twelfth car from the caboose while the train was pulling out of Argenta, and in passing from the twelfth to the thirteenth car, going towards the engine, where his duty called him, he fell between the cars. His body was found lying face downward, the head being towards Argenta and the feet towards Fort Smith. The head was severed from the body and indicated that it was run over by the wheels on the right hand or north side of the train as it was passing west. The clothing was not disturbed, and the blood and brains were immediately around the body, indicating that the body had not been dragged by the train after it was struck.

The appellee, as administratrix of Hempfling's estate, brought this suit, predicating her right of action upon the negligence of the appellant in failing to equip the two Illinois Central cars between which Hempfling fell with handholds or grab-irons, which were shown to be necessary to enable brakeman to pass safely from one car to another in the discharge of their duties. Negligence was also alleged in failing to provide a safe track for the passing of trains at the rate of speed that the train was running at the time.

The appellant denied all the material allegations of

the complaint, and set up affirmatively the defenses of contributory negligence and assumed risk.

Giving the facts their strongest probative force in favor of the appellee, the testimony tends to show the following:

Hempfling was a stout healthy man, pretty active and got about the cars in good shape. He was an experienced brakeman, a man of good habits, and industrious, and was earning about $100 per month at the time he was killed. The thirteenth car was an 80,000 capacity and the twelfth car 100,000 capacity. The twelfth car was about forty-two inches from the floor to the top of the side. The thirteenth car was about thirty-six inches from the floor to the top of the side. The twelfth car was a solid car, that is, didn't have drop ends. The thirteenth car was a drop-end car, and had the ends down at the time of the accident. The twelfth car had hand-holds on the sills on both ends and one grab-iron on the front end, the direction in which the train was going, to the right of the middle, and about eighteen inches down from the top of the car, making the grab-iron about twenty-six inches from the floor. The thirteenth car had a sill handhold between the coupler and the outside of the car on the right side. There were no grab-irons at all on the thirteenth car except on the sills. The handholds on the sills were used for breaking purposes while the brakemen were on the ground. A majority of the Missouri Pacific-Iron Mountain cars have grab-irons in the middle of the end of the cars, over the couplers, ranging in number from three to five. The 80,000 capacity cars have from three to four and the 100,000 capacity cars from four to five. These grab-irons are from the drawbar to the top of the car at different distances. They are from eighteen to twenty-five inches long. They are placed there for the use of the train men in going from one car to another and are for the protection of the brakemen while the train is in motion. The brakemen, whether they cross to the right or to the left of the center of the car in passing from one car to the other

car, reach these grab-irons from any part of the end of the car. Most of the Missouri Pacific-Iron Mountain system cars had ladders down the center of the ends. That was the latest way in which they were equipped. The different railroads haul cars interchangeably and a brakeman don't pay any attention to what system or company a certain car belongs. He performs his duty with reference to the train he is on regardless of any car in it being the property of another company.

The train on which Hempfling was employed that night was made up at Argenta, where the railway company maintain an inspector whose duty it was to go over the train and see that it was in good order before the train left. If in the inspector's judgment a car was not properly equipped with grab-irons it would be his duty to have them put on or cut the car out of the train.

The thirteenth car had only about an inch and a half of sill between the end of the car and the drop end; but these projections were not sufficient to constitute footholds. The space between the two cars was something like two and a half feet. It was the usual and customary method for brakemen to use the grab-irons in going from car to car while the train was in motion. It was more convenient and less dangerous for them to use these handholds and their absence increased the hazard to the brakemen if the train was in motion and making a speed of ten to fifteen miles an hour, as it was doing when Hempfling was killed. A brakeman can steady himself in going from car to car while the train is in motion without using the handholds on the end.

The rules of the Interstate Commerce Commission, although adopted after the injury, were introduced without objection, for the purpose of showing what was considered by it as proper equipment of cars for the necessary protection of train men in the way of grab-irons or handholds, and these rules showed that eight or more handholds to the car, four at each end, in addition to the sill handholds, were necessary. It was also shown that in all of the large cars they usually have foot rests

and two handholds above them, and where there were no foot rests three handholds above where the foot rests would be.

It was shown that at the place where Hempfling was killed there were low joints in the track where the rails come together, which would cause the cars to roll and tilt as they passed over the track and make "it disagreeable to get over."

One of the witnesses testified that in attempting to pass from one car to the other "it is safer to take hold of the handhold. If there is no handhold to the car to which you are going you have to step from the other car to that car without holding to anything, and if the end of the front car is down there would be no handhold or anything else Hempfling could have held to; he just had to jump to the front car." Witness further testified that he didn't need the grab-irons on any car, but that he usually used the grab-irons.

Another witness testified that there would be no danger at all if there were grab-irons in the usual and proper place, but that if the grab-irons were not there the result is a brakeman "might get the worst of it. He is always expecting them there because it is the general rule that they are there."

There was further testimony to the effect that it would not be safe for a brakeman to go over the cars at the place where Hempfling was killed where the cars didn't have grab-irons upon them; that it would be a chance whether he got over. Witness testified that if a brakeman in pursuance of his duties in crossing cars finds no grab-irons that he is supposed to get over anyhow. One witness testified that "if a brakeman would lose his balance in leaving a car and fall towards the drop end of car, if the drop end had grab-irons he could grab at these grab-irons like a drowning man grabbing at a straw. If there had been a grab-iron where they are always found on this drop-end door, a brakeman falling on that door might have saved himself." Another one

states that if he had fallen where the grab-irons were, if they had been there, he might have caught hold of them.

A witness who was a fellow-brakeman with Hempfling and who was on the twelfth car when Hempfling boarded the same, in describing the occurrence, says: "I started towards the caboose and he started towards the engine and climbed over the car. I don't know whether I got over the next car or up on the first car. I heard something that attracted my attention like a lamp globe brake and I looked around and couldn't see him, and I felt the car run over something, and went there and found his lamp globe and gave them a stop signal, and stopped the train, and I went back and found him dead. The lamp globe was broke and the lantern was up in the car that he was getting into." Witness didn't remember how far in the car, but he thought just near the end gate. Witness didn't know where the lamp struck when it crushed.

Another witness testified that the oil "which had apparently been spilled from Hempfling's lantern was on the thirteenth car, on the left-hand side, near the center of the car, as the train was proceeding, and about two feet from the end gate." Witness discovered oil and a piece of the lantern globe. The lantern itself had been picked up by some one else when witness got there.

The appellant requested a peremptory instruction, and also presented prayers for instructions to the effect that there was no negligence "because of any defect in handholds" and "because of any defective condition of the track." And also presented requests for instructions to the effect that under the facts disclosed Hempfling had assumed the risk.

The court, at the instance of the appellee, and also at the instance of the appellant, gave instructions presenting the issues of negligence, contributory negligence and assumed risk. The jury returned a verdict in favor of the appellee in the sum of $4,000. Judgment was entered for that sum, and appellant duly prosecutes this appeal.

*Thos. B. Pryor* and *Vincent M. Miles,* for appellant.

1. No negligence is proven. 44 Ark. 524. Negligence must be proven. 67 C. C. A. 421; 139 Fed. 737; 145 *Id.* 327; 101 Wis. 371; 133 N. Y. 659; 179 U. S. 658; 47 Minn. 384; 190 Fed. 717.

2. Deceased assumed the risk. 57 Ark. 503; 82 *Id.* 11; 56 *Id.* 206; 143 Mass. 197; 196 U. S. 57; 191 *Id.* 64.

*U. L. Meade* and *Hill, Brizzolara & Fitzhugh,* for appellee.

1. Negligence of imposed duties on the master's part was duly proven. 127 Mo. 336; 81 Me. 572; 153 Mass. 297; 7 N. Y. Supp. 510; 103 Ark. 61; 57 Ark. 402; 76 *Id.* 436. Deceased did not assume the risk. Cases *supra.* 37 C. C. A. 1.; 94 Fed. 781.

2. It is negligence not to have cars equipped with appliances for the safety of employees in general use by all well regulated railroads. 9 So. 276; 164 Pa. St. 17; 127 Mo. 326.

Wood, J., (after stating the facts). The issues in the case, on the pleadings and facts adduced, were submitted to the jury upon correct declarations of law from the trial court, and the evidence was amply sufficient to sustain the verdict. If Hempfling was killed by reason of the negligence of appellant, as alleged in the complaint of the appellee, then there was no assumption of risk on the part of Hempfling, because such negligence was not one of the ordinary risks incident to his employment as a brakeman. The negligence in failing to exercise ordinary care to provide handholds or grab-irons necessary for the proper protection of the brakemen while in the discharge of their duties, and also to provide a safe track, was the negligence of the master, which the servant under the evidence did not assume.

Under the evidence it was customary for cars like the ones under consideration to be furnished with as many as four handholds for the protection of brakemen. Hempfling had every reason to anticipate that these handholds had been furnished. He had no opportunity

before he started upon his journey to ascertain that they had not been provided, nor was it his duty to make any inspection of the car to ascertain this defective condition of the cars. Nor was it such an open and obvious defect that he was bound to know thereof. On the other hand, he had a right to assume that the company had not been negligent in providing safe appliances for doing the character of work that he was called upon to do. It was the duty of the inspector not to permit defective cars to go into the makeup of a train.

Learned counsel for appellant, while conceding that the testimony tended "to prove that there were a less number of grab-irons on the two cars than was usual and customary," and "that the track over which the train was being operated at the point at which decedent met his death was rough and uneven," nevertheless contend that "there is not a syllable of testimony in the record that either of these conditions contributed in any way to the death of plaintiff's decedent." This is the most serious question presented by the record. But we are of the opinion that the testimony was sufficient to warrant the finding of the jury that Hempfling's death was caused through the negligence of appellant as alleged in the complaint. The facts adduced in evidence, as disclosed in the statement, were sufficient to warrant any reasonable mind in concluding that Hempfling's death was caused by the failure on the part of the appellant to provide grab-irons on the ends of the two cars between which he fell at the time he was crossing from one to the other.

Hempfling was an experienced brakeman, in good health, strong and active. As one of the witnesses expressed it, "he was a good steady man, industrious and kept at his work." It is not at all probable that such a man, pursuing his work in the usual way, would have fallen between the cars and lost his life if there had been the usual and customary safeguards provided by the appellant, and which were necessary to be provided for

the protection of brakemen while crossing from one car to the other.

While there was no eye-witness to the manner of Hempfling's death, it is certain that he came to his death by falling between the cars, and it is reasonably certain that he would not have fallen if the customary handholds for his protection had been provided.

This is not a case where the evidence is consistent, "equally with the existence or nonexistence of negligence," as in *C. & O. Railway Co.* v. *Heath,* 48 S. E. 508. It is not a case where negligence and proximate cause of death are to be inferred merely from the accident and left as mere matter of conjecture or guesswork for the jury, as in *Midland Valley Railway* v. *Fulgham,* 181 Fed. Rep. 91, and the many cases there cited. Nor is it a case where the proof shows that "one of a half dozen things may have brought about the injury." Nor was it a case where one of several things, for some of which the appellant was responsible and some of which it was not responsible, produced the injury, leaving the jury to guess which one, as in the case of *Bolen-Darnall Coal Co.* v. *Hicks,* 190 Fed. 717, relied on by counsel for appellant. But here, as we view the evidence, the death of Hempfling was consistent only with the conclusion that he fell from the car by reason of the fact that he had no grab-irons by which to hold as he was attempting to pass from the twelfth to the thirteenth car, as mentioned in the testimony. In other words, his death was consistent only with the existence of negligence on the part of the company in failing to provide these handholds.

The jury were not invited to guess, without any proof, as to the probable cause of Hempfling's death. The law is well settled that where there are no eye-witnesses to the injury and the cause thereof is not established by affirmative or direct proof, then all the facts established by the circumstances must be such as to justify an inference on the part of the jury that the negligent conditions alleged produced the injury com-

plained of.  Where such is the case the jury are not left
in the domain of speculation, but they have circum-
stances upon which, as reasonable minds, they may
ground their conclusions.  Negligence that is the proxi-
mate cause may be shown by circumstantial evidence as
well as by direct proof.

Here practically the uncontroverted evidence shows
that appellant was negligent in failing to provide hand-
holds which were necessary to insure the safety of the
brakemen in the discharge of their duties, and we con-
clude that there was, at least, substantial evidence to
warrant the jury in finding that the absence of these
handholds caused the death of Hempfling.  There was
no evidence to warrant an inference that Hempfling fell
between the cars by reason of any inadvertence or any
imprudence on his part in attempting to cross from one
car to the other.  There was nothing to warrant the in-
ference that his fall was the result of mere accident.  On
the contrary, a brakeman of Hempfling's build, health,
experience and habits of work would not likely have
fallen through negligence or inadvertence.  Such a con-
clusion, under the evidence, would be unreasonable.  But
it was quite reasonable for the jury to conclude that
Hempfling started to cross from one car to the other
in the usual way, as the evidence shows, and that in
reaching for the grab-irons which he expected to find
he discovered and probably rested his foot on the one
grab-iron on the car, while holding to the top and nat-
urally supposed that the other grab-irons were also pres-
ent on the car as they should have been, and in attempt-
ing to lower his foot to one of these grab-irons below the
top one, he went down straight under the car because
the grab-irons were not there.  The position of the
broken globe and lantern and the place where the oil was
found on the drop end of the other car are not incon-
sistent with the idea that Hempfling went to his death
in the manner indicated; because in the fall Hempfling,
in attempting to catch the grab-iron on the thirteenth
car and thus support and save himself, might have struck

the lantern in the manner indicated by the position of the oil and the lantern itself and broken globe. Or, the jury might have concluded that Hempfling attempted to pass over the car by jumping down from the twelfth to the thirteenth car and in so doing that he slipped and fell between them, striking his lantern at the place indicated by the oil on the drop end in an attempt to catch a handhold which he supposed was present on that end; and the jury were warranted in finding that if this was the way in which he fell he might still have saved himself from death by the presence of the handhold. But in either event, in a clear fall between the cars, with no handholds to catch to and nothing else on which to hold, Hempfling was caught in a veritable death trap.

The witnesses showed that no matter in what manner he may have fallen, if the handholds had been provided he might have saved himself by catching same as he went down. So, as stated, the conclusion of the jury that the unfortunate death of Hempfling was the result of the absence of the handholds on the ends of the cars is not based on conjecture but has substantial basis in the evidence to rest upon.

The law applicable here is well stated in a somewhat similar case from Missouri, as follows:

"In actions for damages on account of negligence plaintiff is bound to prove not only the negligence, but that it was the cause of the damage. This causal connection must be proved by evidence, as a fact, and not be left to mere speculation and conjecture. The rule does not require, however, that there must be direct proof of the fact itself. This would often be impossible. It will be sufficient if the facts proved are of such a nature, and are so connected and related to each other that the conclusion therefrom may be fairly inferred." *Settle v. St. L. & S. F. Rd. Co.,* 127 Mo. 336; see also *Guthrie v. Maine Central Ry. Co.,* 81 Me. 572; *Coats v. Boston & Maine Ry.,* 153 Mass. 297; *Pullutro v. D. L. & W. Railroad,* 7 N. Y. Supp. 510; cited in appellee's brief. In the recent case of *St. Louis, Iron Mountain &*

*Southern Ry. Co. v. Owens,* 103 Ark. 61, 145 S. W. 879, the facts tending to show the causal connection between the alleged negligent act and the death of the brakeman were established by circumstantial evidence only. To say the least, they were no more cogent than the facts relied on in this record to show such connection. In that case the court, after announcing the rule that there must be something more than mere conjecture to sustain the finding of the jury, said:

"While this salutary rule is not to be ignored, it is equally well settled that any material fact in controversy may be established by circumstantial evidence, and that, though the testimony of witnesses may be undisputed, the circumstances may be such that different minds may reasonably draw different conclusions therefrom. Such a state of case calls for a submission to the jury of the question at issue; and where the circumstances are such that different minds may reasonably draw different conclusions therefrom, and the result is not a mere matter of conjecture without facts or circumstances to support the conclusion, then it is the duty of an appellate court not to disturb the finding of the jury."

Applying the doctrine of the above cases to the facts of this record, the judgment is correct, and it is therefore affirmed.