BIDDLE *et al.*, RECEIVERS, *v.* JACOBS.

Opinion delivered December 21, 1914.

1. NEGLIGENCE—CONCURRENT CAUSES—LIABILITY.—In an action for damages caused by negligence, where the evidence as to the cause of the injury leaves the question to conjecture between causes for one of which the defendant would not be liable and a cause or causes for which it would be liable, the plaintiff will fail.

2. VERDICT—NEGLIGENCE—CONCURRENT CAUSES—LIABILITY.—When the evidence tends equally to sustain either of two inconsistent propo-

sitions, a verdict in favor of the party bound to maintain one of them against the other is necessarily wrong.

3. VERDICT—EVIDENCE—CONJECTURE.—Verdicts can not be predicated upon conjecture.

4. NEGLIGENCE—WRONGFUL DEATH—CONCURRENT CAUSES—SUFFICIENCY OF THE EVIDENCE.—In an action for damages for personal injuries resulting in death, growing out of negligence, it is necessary that a preponderance of the evidence should show that the death resulted from the injury received, by reason of defendant's negligence.

5. NEGLIGENCE—PERSONAL INJURIES—EVIDENCE—CAUSAL CONNECTION.—In an action for damages caused by negligence, plaintiff must prove not only the negligence, but that it was the cause of the damage; there does not, however, have to be direct proof of the fact itself, it being sufficient if the facts proved are of such a nature, and are so connected and related to each other that the conclusion therefrom may be fairly inferred.

6. NEGLIGENCE—WRONGFUL DEATH—SUFFICIENCY OF THE EVIDENCE.—Deceased was injured in a railroad wreck, and died shortly thereafter. At the time of his death he had a tumor at the base of the brain. *Held*, under the evidence, the jury was warranted in finding that the tumor was caused by the injury, and that defendant's negligence was the cause of deceased's death.

Appeal from Lawrence Circuit Court, Eastern District; *R. E. Jeffery, Judge;* affirmed.

STATEMENT BY THE COURT.

Appellee is the administratrix of the estate, and the widow, of A. C. Jacobs, deceased. She alleged in the complaint which she filed in this cause that her intestate, on August 19, 1913, became a passenger on one of appellee's trains operated between Fort Smith and Mansfield, and that this train collided with a train of the Midland Valley Railroad, as the result of which her intestate sustained certain injuries from which he died, after great suffering, on the 30th of December, 1913.

Appellant makes no denial of its negligence, nor of its liability for any damages which may have resulted from this collision. There was a judgment for a large sum of money, but it is not urged that the verdict is excessive. Indeed, appellant complains of no error committed at the trial, except that it says there is no preponderance of the evidence that intestate's death was at-

tributable to any injury received in this collision, and that the verdict of the jury to the contrary is supported only by conjecture. Appellant offered no evidence in its own behalf, but says that appellee's evidence was legally insufficient to sustain the verdict of the jury.

Upon this issue we must view the evidence in the light most favorable to appellee and, when thus viewed, it would have supported the following findings of facts: That the train upon which deceased was a passenger consisted of an engine and two coaches, and deceased was seated next to the window and about the middle of the chair car, with one arm resting upon the window sill and his foot upon the water pipe. That the chairs of the car were constructed of cast iron, the seats being supported by a pedestal formed of that material, firmly attached to the floor. That deceased was an attorney, and was at the time en route to Booneville to assist in the defense of a man charged with murder. The trains which collided were running fifteen or twenty miles an hour, and the impact was of such force and violence that many seats were torn from the floor, their backs broken and passengers thrown violently from their seats. The back of the chair in which deceased was seated was broken, and he was violently precipitated backward to the floor. Immediately after the collision, the deceased, upon being asked if he was hurt, replied that he "was hurt some," and, after rendering assistance to several of the ladies, and upon reaching the ground, he complained of his arm, back and shoulder blade, and was holding his arm in an unnatural position, and while lending assistance to others he manifested symptoms of discomfort by shrugging his shoulders and attempting to straighten himself. His complaints caused a Mr. Brock, who was also an attorney and was deceased's traveling companion, to examine his back at the scene of the collision, where there was discovered a bruised condition between the shoulder blades, about three-quarters of an inch in length, and the following night deceased complained of increased pain in his back. He remained at Mansfield the night of the ac-

cident, and went to Booneville the next morning, where he remained for nearly a week. During this time he was engaged in the trial of a cause there, and he manifested symptoms of pain and suffering, and seemed to be nervous and uneasy, and while at Booneville he was frequently seen moving his body in a manner that indicated soreness and a feeling of uneasiness and pain. He returned to Clarksville, his home, within a week after the accident, and his condition at that time was plainly noticeable by his law partner, who stated that, when deceased came into the office, there were traces of pain in his eyes and a seriousness about him which he had never observed before, and that deceased was never a well man afterward, and that deceased's pains continued to become more serious and severe. That shortly after the collision, deceased's eyesight became affected, and his locomotion impaired, and he experienced difficulty in climbing the stairs, and dreaded to do so. That he complained of having headaches and the pain in his back grew worse, and he later suffered pain in the base of his head, and frequently described it as "feeling as if some one was cutting the brain with a knife." Deceased went about to some extent as late as October, but all of his acquaintances had previously observed his changed condition, in fact, the testimony was that this changed condition was observable upon his return home after his injury. The proof is that, prior to his injury, he was a strong, healthy, vigorous man, of erect carriage, and athletic build, and a doctor, who became the principal witness in the case, testified that he had known deceased from his childhood and had been his physician for years, and that he was a man of unusual strength and of excellent health, but that within a week after the injury deceased's manner had changed, and he complained of pains in his back and head, and within two weeks after the injury deceased suffered a partial stroke of paralysis in his arm and leg, and was compelled to use a cane. This doctor testified that, upon his second examination of deceased, he found that his temperature was below normal

and his pulse too rapid, and that deceased took on a downcast, dejected appearance, and lost his accustomed snap and vigor, and ceased to be able to hold himself erect as he had done before his injury, and began to walk in a sidewise manner, half stooped or leaning over, and began to drag his foot and to walk with difficulty. This doctor was examined and cross-examined at great length, and, while he stated that he did not know the cause of deceased's death, further than that it resulted from a pressure on the brain, he stated, in a most unequivocal manner, that, in his opinion, death was caused by the injury received in this collision. This witness testified, however, that death might have been caused by a tumor upon the brain, and he defined the symptoms attendant upon a brain tumor and stated that these symptoms were present in this case, although he stated his opinion to be that deceased did not die from that cause.

The evidence of all the witnesses was to the effect that deceased gradually grew worse and that his death was unquestionably caused by a pressure of some character upon the brain, and this pressure grew gradually stronger and, after causing the most indescribable suffering, finally resulted in deceased's death.

The doctor testified that the exact cause of death could have been ascertained only by the performance of an autopsy. No autopsy was ever performed.

Appellant insists that the very manner in which deceased died shows that there was no laceration leading to the formation of a blood clot, and the brief in its behalf contains a most interesting presentation of this view of the evidence. It is urged that such an injury will produce a certain effect, and that whatever blood clot might form from such an injury would form at once, and its result would be immediately apparent, and that in such a case the blood clot would become absorbed and the patient recover, or, if this did not happen, the injured party would in no case grow gradually worse, but the effect of the blood clot would be immediately apparent.

In the course of the cross examination, the physician made the following statement in response to a question about traumatic injuries increasing in size:

"A.   Well, I might not be able to tell you.   This is what happens, as we think:   We have blood poured out and we have a little clot there; that forms a little clot maybe; and if these little clots in a month or two months or six months or a year, may be absorbed.   They don't take on life.   It acts as dead matter and this is absorbed, taken up, disappears; whereas, on the other hand, we may have a rent sufficiently extensive to have the pouring out of some blood, a clot forms, and after a little while the little minute blood vessels that surround it seem to begin to nose about some way or other or in some particular way it begins to be free, and it takes on, some way that we don't exactly understand, a disposition to live and to grow and to develop and enlarge.   That is what we call a blood clot trying to become organized and that becomes a tumor, just a growth, or something that don't belong there.   And it would have the same kind of symptoms and give you the same kind of trouble that we had in this case in Mr. Jacobs' case."

This statement is assaulted with great vigor, and it is insisted that we should disregard it as being contrary to all common knowledge and common experience and, therefore, without probative force.

*W. F. Evans* and *W. J. Orr,* for appellants; *Ponder & Ponder,* of counsel.

1.   The death of Jacobs was not caused by the injuries received in the collision.   There is absolutely no proof of that fact.   Verdicts must rest upon facts in evidence and *not* on speculation and conjecture.   Where the evidence leaves the cause of death to conjecture as to the liability of a railroad, the plaintiff must fail.   179 U. S. 658; 21 Sup. Ct. 275; 150 S. W. 572.   Courts are not required to give credence to statements of witnesses that falsify the well known laws of nature. 171 Mo. 116; 79 Ark. 608; 106 S. W. 947; 19 *Id.* 751; Rogers on Expert Testimony, Nos. 8-12-13.

2. The testimony of experts must be predicated upon facts in evidence, not mere opinions. 119 N. W. 200; 120 *Id.* 521; 76 Pac. 174; 134 *Id.* 338; 13 Cyc. 216.

*Geo. F. Patterson, W. E. Atkinson, F. M. Seawell,* and *Frank Pace,* for appellee.

The evidence shows that death resulted from the injuries received in the collision. All the medical experts and other witnesses show this beyond doubt, and the history of the case proves it beyond doubt. 48 Minn. 26; 36 Ill. App. 68; 177 Mass. 179; 36 Fed. 167; 69 N. Y. App. Div. 442; 28 Col. 129; 1 Thompson on Negl., par. 153-4; 13 Nev. 340; 104 S. W. 1011; 124 Mo. App. 230; 7 Thompson on Negl. 153; 89 Hun. (N. Y.) 374; 102 Mo. 582; 6 N. Y. Supp. 504; 59 N. Y. App. Div. 363; 69 N. Y. Supp. 550; 61 Mich. 619; *Id.* 622. Whether the direct causal connections exist, is a question, in all cases, for the jury upon the proved facts. 98 Ark. 352; 104 Mo. 382, and cases cited, *supra.* The injury is deemed the cause of death if death was hastened by the injury. 1 Thompson on Negl., par. 149; 91 Tenn. 56. See also 95 S. W. 1118; 213 Ill. 274; 13 Cyc. 216; 96 Ark. 358.

SMITH, J., (after stating the facts). (1) Appellant invokes the rule that, where the evidence as to the cause of death, or any other effect, leaves the question to conjecture between causes for which appellant would not be liable and a cause or causes for which it would be liable, the appellee must fail.

(2) That this is the law is well settled by the decisions of this court. In the case of *Railway* v. *Henderson,* 57 Ark. 414, Justice MANSFIELD quoted with approval from the case of *Smith* v. *Bank,* 99 Mass, 605, the following language: "When the evidence tends equally to sustain either of two inconsistent propositions, a verdict in favor of the party bound to maintain one of them against the other is necessarily wrong."

(3-4-5) Verdicts can not be predicated upon conjecture, and to apply that principle to the facts of this case, it may be said that it is not sufficient that a reasonable

view of the evidence is that the collision might have caused deceased's injury. It is essential under the issues in this case that a preponderance of the evidence should show that his death resulted from the injury received in the collision. Such proof is not required, however, to exclude all doubt on the subject, nor is it required that the proof show the death could not, or that the death did not, in fact, result from a tumor, or some other cause not attributable to the collision. But it is sufficient if the evidence reasonably warrants the jury in finding from a preponderance of the evidence that deceased's death did, in fact, result from an injury received in this collision. If that finding rests upon mere speculation or conjecture, it can not be said to be warranted by the evidence. A number of authorities on this subject were reviewed in the opinion in the recent case of *Denton* v. *Mammoth Spring Electric Light & Power Co.*, 105 Ark. 161. And other authorities are cited in the more recent case of *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Hempfling*, 107 Ark. 476. In this last named case there was quoted with approval, from the case of *Settle* v. *St. Louis & S. F. Rd. Co.*, 127 Mo. 336, the following language: "In actions for damages on account of negligence plaintiff is bound to prove not only the negligence, but that it was the cause of the damage. This causal connection must be proved by evidence, as a fact, and not be left to mere speculation and conjecture. The rule does not require, however, that there must be direct proof of the fact itself. This would often be impossible. It will be sufficient if the facts proved are of such a nature, and are so connected and related to each other that the conclusion therefrom may be fairly inferred."

(6)   Does the evidence in this case meet the requirements above stated? We think the jury's finding is based upon evidence legally sufficient to sustain the verdict. Here there were no premonitory symptoms of an approaching tumor, which is shown to be a disease which very gradually makes its appearance and very gradually accomplishes its deadly work. Deceased left his home a

well man and returned within a week noticeably changed in his appearance. The only physician who testified in the case stated that appellant could have received the injury from which he died in this collision and testified that a collision was a very good place to get an injury such as, in his opinion, caused deceased's death. Indeed, there is no cause assigned for deceased's condition except that he did sustain an injury in this collision, and it is only surmise and conjecture that there might have been some other cause.

Under this state of the proof we do not feel disposed to overturn the verdict of the jury. The failure to have an autopsy performed was a circumstance to be considered by the jury, but we can not say as a matter of law that that failure must defeat a recovery. The judgment is affirmed.