SADLER, TRUSTEE, *v.* SCOTT.

4-6590                                            158 S. W. 2d 40

Opinion delivered January 26, 1942.

*Lawrence E. Lister* and *R. S. Wilson,* for appellant.
*Batchelor & Batchelor,* for appellee.

HOLT, J.   January 16, 1941, Troy Scott sued the Arkansas Oil & Mining Company, Inc., to recover $5,013.50. Thirteen dollars and fifty cents ($13.50) of this amount was alleged to be due for labor in drilling a well for oil, and $5,000 was claimed as a bonus under a written contract between Scott and the company. Upon a trial to a jury, there was a verdict for Troy Scott in the amount of $5,000 for the bonus, and a judgment entered for this amount. This appeal followed.

After this judgment was obtained, the Arkansas Oil & Mining Company, Inc., was adjudicated a bankrupt

and Nelson H. Sadler was appointed trustee. Troy Scott, after procuring the judgment, sold and assigned his interest therein to J. L. Post and Mike Meyer.

The evidence is to the effect that the oil company entered into a written contract on August 12, 1939, with Troy Scott, a well driller, and the bonus claimed is based upon the following provision in the contract: "The employer on its part agrees to pay the employee $3 per day for his work. It is further agreed that should the well, when completed, produce gas or oil in paying quantities, then in that event the employer agrees to pay this employee in addition to the $3 per day, $5,000, said $5,000 to be paid out of the first 1/16th of the employer's share of the oil and gas taken from this well or any other wells in the field, should the field prove a producing one, but in no event is the amount paid to exceed $5,000. Depth to commercial oil or 3,500 feet."

In May, 1939, prior to the execution of the contract, Scott began work at the well in question. At this time the well was down about 20 feet. He continued at the well, under an oral contract of employment, until the execution of the written contract, *supra,* when he took charge of the drilling and put the well down to approximately 1,100 feet, when, he testified, there was a showing of oil and "the bailer was bringing out about 12 gallons of free oil an hour. That would be 288 gallons every 24 hours." He further testified that he requested the oil company to acidize the well at that depth in order to increase the flow of oil, which they refused to do, and on instructions from the company, he continued to drill to about 1,650 feet without any additional oil showing, and that at that point all drilling ceased. It was his opinion that had the company acidized the well "I would say that it would have been a 100 barrel well." He based this opinion upon some 25 years of experience in drilling for oil and his observations of the well in question. He further testified "I didn't save any of the oil, but dumped it into the slush pit," and the only way to ascertain the production of the well as to actual capacity is to measure the oil.

Another witness, Mr. Bryan, secretary and treasurer of the bankrupt company, testified that on going to the well he smelled an odor like crude oil; that the drill bucket and bit had oil on them; and there was some on the slush pit. Quoting from his testimony: "Q. Were you ever propositioned by anybody to plug that hole up there? A. Yes, sir. Q. How much were you offered? A. They never did say exactly, they said it would run from $20,000 to $30,000 to plug the hole."

Ira Miller testified on behalf of appellee that he went to the well and observed that the oil drill stem and bit were greasy as having been oiled; that you could smell the oil, and that the slush pit had oil on it. He thought he would know the difference between shale oil and live crude oil, and does not know whether the bailer was run while he was there.

There was other evidence tending to corroborate appellee's testimony.

Mike Hofrichter, on behalf of appellant, testified that Troy Scott called him to the well claiming a showing of oil. He saw the bailer run and he observed in it a brown looking shale. He examined the tools and drill and saw nothing but a "shaley substance" or a "brown skum." There was no indication of oil. Troy Scott did not show him any oil that was alleged to have come from the well.

Mays England testified that he went out to the well after the alleged oil showing and saw the bailer run four or five times. There was no showing of oil at all. He had been around a number of producing oil wells.

Harry Ruth, for appellant, testified that he was an oil driller by trade and had been for more than 25 years, having worked in a number of states; that he had drilled and brought in wells in "wild cat fields." He went to work on the well in question when it was down about 1,400 feet, after the alleged discovery of oil by Scott; that if free oil is discovered in a test well, it will leave an indication on the casing in the well. He never saw any indication or evidence of oil; that the closest oil sand to the well in question is the Bartlesville sand, and that this sand

was not struck in the well in question; that during the time he was drilling the well in question he did not strike any showing of oil or any sand or lime formation that indicated there was free oil in the well.

David Maxwell testified that he was working at the well at the time of the alleged oil showing, and that there was no evidence of any oil showing that he knew of. He saw some black stuff like foam. They tried to burn it, but it would not burn.

Everett Brammer, another employee, corroborated Maxwell's testimony.

Albert Burke testified that he visited the well in question and saw the casing being pulled and saw no sign or indication of oil.

The well was being drilled in what is commonly called "wild cat territory." Before Troy Scott would be entitled to recover the $5,000 bonus stipulated in the contract, *supra*, it devolved upon him to show by substantial evidence that the well in question produced oil in paying quantities. After a careful review of the record before us, we have reached the conclusion that not only is there no substantial evidence to support the jury's finding that oil was produced in paying quantities, but there is no substantial evidence that any oil was produced in the well in question. When giving to appellee's testimony its strongest probative force, the most that can be said of it is that it is based purely on speculation, conjecture and guess. Appellee admits that, although the opportunity was present, he never at any time preserved any of the substance which he thought to be oil. No chemical analysis by any one was ever attempted or made of the substance which appellee thought to be oil. No attempt was ever made to measure the alleged flow of oil. We have many times said that verdicts of juries must be based on, and supported by, some substantial evidence and not on mere speculation or a guess. *Hough v. Leech*, 187 Ark. 719, 62 S. W. 2d 14.

In *Coca-Cola Bottling Company of Southeast Arkansas* v. *Bell*, 194 Ark. 671, 109 S. W. 2d 115, this court said: "Proof of the fact that a fly was found in the

bottle, and that flies do carry the germ of the disease from which appellee is suffering, does not suffice to support the verdict. It is mere conjecture that the fly found in the bottle was a carrier of the germ and had communicated the disease to appellee. The only definite proof upon the contamination of the drink is to the effect that no parasites were found therein, and while it may be true that this test was not conclusive the fact is that it is the only testimony upon that issue of fact, and it is mere surmise and conjecture to say that the portion of the drink consumed by appellee was in fact tainted and infected with a germ which caused the disease, while the remaining portions of the drink were not.''

And in the recent case of *The Coca-Cola Bottling Company* v. *Wood,* 197 Ark. 489, 123 S. W. 2d 514, this court citing with approval the Bell case said: ''Giving to the above testimony of appellee its strongest probative force, and ignoring appellant's testimony, we hold that it is not sufficient to support a verdict for appellee, because there is no evidence disclosed by this record of a substantial nature upon which a verdict can be based. The contents left in the bottle of Coca-Cola in question were never chemically analyzed, and no one knows whether there were any harmful ingredients in these contents or not. To assume that there were, and that such was the proximate cause of appellee's injuries, would be the purest speculation and conjecture, and but a guess. It has long been the settled rule of this court that verdicts of juries cannot be based upon speculation and conjecture, or guess. In *Russell* v. *St. Louis, S. W. Ry. Co.,* 113 Ark. 353, 168 S. W. 135, we said: 'But conjecture and speculation, however plausible, cannot be permitted to supply the place of proof. *St. Louis, I. M. & S. Ry. Co.* v. *Hempfling,* 107 Ark. 476, 156 S. W. 171, and cases there cited'.''

And in *St. Louis, S. W. Ry. Co.* v. *Braswell, Admr.,* 198 Ark. 143, 127 S. W. 2d 637, this court said: ''All judges, both trial and appellate, agree that to support a verdict the evidence must be of a convincing nature, imparting the qualities of reasonable certainty. . . . It would seem, however, that in any view to be taken,

the issues are whether the evidence is substantial, and who is to judge of that quality. If this is not a question of law, then substantiality loses its significance, with the result that any testimony may suffice. If we acquiesce in this construction there is an abdication of judicial responsibility.''

Even though it could be said that what appellee thought was a showing of oil was in fact an oil showing, there is no evidence in this record of a substantial nature that such oil showing was in paying quantities, as the terms of the contract in question required.

The textwriter in Thornton's Oil & Gas, volume 2, p. 1008, § 709, in discussing what is meant by sinking a well to ''paying quantities'' says: ''If the contract be to sink the well to 'paying quantities' then merely finding a small and not a flowing oil is not a compliance with the contract, and the driller is not entitled to recover for his work.''

Accordingly the judgment is reversed, and since the cause seems to have been fully developed, it is dismissed.