TRI-COUNTY GAS & APPLIANCE v. CHARTON.

5-1675                                              320 S. W. 2d 103

Opinion delivered January 26, 1959.

*J. M. Smallwood,* for appellant.

*Brazil & Brazil, Gordon & Gordon,* for appellee.

CARLETON HARRIS, Chief Justice. Catheryn Charton and E. A. Mayall, her father, instituted suit against the Tri-County Gas & Appliance Company and Gerald Powell for damages, alleging that Mrs. Charton ordered propane gas from appellant company, which was delivered by their employee, appellant Powell; that Powell placed more gas into the tank than it was designed to accommodate, which resulted in excess gas forcing its way through the mechanism of the head of the tank, and through the pipe leading from the tank into the house occupied by Mrs. Charton, on through the jets or burners of a stove, and subsequently into the rooms of the house. The Complaint then alleged that Mayall was visiting in the home of appellee Charton around 6 p. m. on October 2, 1957, and that appellees went into a small closet in the house to move some clothing, and, the room being dark, struck a match, whereupon an immediate explosion with a great burst of flame oc-

curred, and appellees were severely and painfully burned; that the house and contents were consumed by fire. Damages were sought by Mrs. Charton in the amount of $28,100, while Mr. Mayall alleged his damages to be $7,750. Appellants answered, denying the allegations, and further alleged that the butane system in the house, together with the container, were installed by appellee Mayall, who was inexperienced and incompetent to install the system, the latter fact being known by appellee Charton; that Mayall was negligent in said installation, and Mrs. Charton assumed the risk of injury from Mayall's negligence in installing the system. It was further alleged that appellees did not exercise ordinary care for their own safety; that the proximate cause of the alleged injuries was the negligent acts of Mayall, in which Catheryn Charton acquiesced, and that appellees were negligent in a degree equal to or greater than any negligence that could be shown on the part of appellants. On trial, the jury rendered a verdict for Mrs. Charton in the sum of $5,208, and for Mayall in the amount of $755, for which sums judgment was entered, together with interest at the rate of 6% per annum until paid.[1] From such judgment, appellants prosecute this appeal. The sole contention for reversal is that the court erred in refusing to direct a verdict for appellants at the conclusion of appellees' testimony, and at the end of all the testimony in the case.

Appellants contend that the evidence as to their responsibility or liability for causing the fire was insufficient to send the case to the jury. They argue that the fire could have occurred from several causes, and that the jury was permitted to, and. did, speculate in reaching the conclusion that appellants were responsible. Of course, a verdict based upon conjecture would be of no validity. *Biddle, et al., Receivers, v. Jacobs,* 116 Ark. 82, 172 S. W. 258. The evidence reflects that appellee Charton started moving into the house in question on the last day of September, 1957, and concluded

---

[1] Westchester Fire Insurance Company, which had intervened, was subrogated to the extent of $1,000 in the judgment awarded to Mrs. Charton, as it had previously paid such amount to her in satisfaction of her claims under a policy insuring jewelry and household goods.

moving on October 1st. However, she did not spend either night on the property. Approximately 10 days earlier, appellee Mayall had made the installation of the butane system on the property. Mayall had no license to install such a system, but had installed his own butane system in two previous houses that he had lived in. He testified that he moved his own tank, which had a capacity of 115 gallons to the Charton property, and stated that the tank was 6 or 7 years old. It was placed about 15 feet from the house, and the installation consisted of putting down the line, attaching it on into the house, piping the house, and setting up two stoves, a cookstove in the kitchen, and a small butane heater "* * * back from the closet in the dining room." Mayall described in detail his method of installing the system, and H. D. Burns, chief technician of the Liquefied Petroleum Gas Control Board (whose testimony will be hereafter more fully discussed) was in the courtroom during Mayall's explanation, and subsequently testified "* * * If I understood his explanation correctly, the connections were made in a manner approved by the department." On installing the stoves, Mayall checked to see that they were properly working. The heater was lighted, then turned off, and was never lighted again. Mayall testified that he checked the tank around 10 or 11 a. m. on October 2nd, and the gauge showed it to be 10% full; that accordingly, gas was ordered from Tri-County.

Mrs. Charton testified that her father took her to the house between 6:30 and 7 o'clock on the morning of October 2nd; that she started cleaning and straightening and "* * * cooked my children just a snack." In addition to cooking breakfast, she testified that she also prepared lunch on the cookstove; that she fixed bacon and egg sandwiches for the children in the afternoon, and that the stove was intermittently off and on all day, as she was boiling water to aid in cleaning the premises. Nothing out of the ordinary was noticed concerning the operation of the stove, i. e., it appeared to be working properly. Powell arrived with the gas around 4:45 p. m. Mrs. Charton stated that he filled

the tank, and then came to the door and asked for a pencil eraser. ''I asked him what he needed with a pencil, or something like that, and he said, 'Well, I can't figure this.' I said, 'Well, what do you mean?', and he said, 'Well, what size tank is this?' I said, 'Well, that I just don't know.''' She testified that Powell figured for a long time and then asked her to figure it, but not knowing anything about gas, she was unable to help. She further testified that Powell stated it was the first tank he had filled by himself, and he didn't know how to figure it. He then gave her a delivery ticket.[2] The ticket showed that Powell found the tank empty and filled it to 90% full, and that he placed 135 gallons of propane gas into the tank. According to Mrs. Charton, Powell left, and around 6 p. m., her father and mother came to the house. Mrs. Charton turned on the cookstove, and a flame shot up 2 or 2½ feet, and she immediately turned the stove off. She and Mayall then went to the closet to get the children's clothes, and the closet being dark (the house not then being wired for electricity), the father struck a match. As Mayall described it:

''When I struck that match — it was just like the world on fire — of course, it didn't last over that long (indicates by snapping fingers). Of course, it burned us up nearly. It burned Catheryn and she was just having one fit after another, and I was trying to take care of myself the best that I could, it burned me pretty bad.[3]
\* \* \*

My hands were both burned badly, and my eyes were burned bad. I mean as red as they could be. And it burned me up in my nose, up inside of my nose. My nose peeled off. It has affected my breathing ever since, and even my ears peeled out on the inside.''

Father and daughter then immediately left the house, and a son-in-law took them to the hospital at Clinton. Around 8 p. m., the house caught fire, and several per-

---

[2] The original was burned in the fire, but the pink duplicate was obtained from the company office.

[3] There is no contention that the award to either appellee was excessive.

sons passing the property between that time and 8:30 p. m., witnessed it. Testimony reflected that the house was almost completely burned, and flames from the tank were shooting 12 or 15 feet into the air. The witnesses described the flames as not being steady, but "* * * would go off and then it would shut down and then it would pop off again." This happened 12 or 15 times while they were watching.

Appellant Powell admitted that he started work for Tri-County on October 1st, filled 15 tanks on that date in company with the local manager of Tri-County, and made 10 calls on the morning of October 2nd. He admittedly had no license to make deliveries of liquefied petroleum gases, and had only 1½ days training before filling Mrs. Charton's tank. Powell had previously been a helper on a delivery truck for the Coca-Cola Bottling Company. According to his testimony, the percentage gauge reflected that the tank was empty. After noting that the tank had the capacity of 115 gallons, he filled it approximately 90% full, and made out a sales slip reflecting that 104 gallons of gas had been placed in the container. He testified that Mrs. Charton stated the tank had a capacity of 150 gallons, and would not sign the slip showing that 104 gallons had been delivered, so he made another slip showing that he had placed 135 gallons in the tank (which is 90% of 150).

The most extensive testimony was given by Mr. H. D. Burns, heretofore identified, and who qualifies as an expert on the subject of butane and propane gas, including its propensities, proper methods of installation, proper servicing, etc. Mr. Burns' testimony was thorough, and exhibited an excellent knowledge of the subject. Necessarily, because of the length, the testimony cannot be discussed in detail, and only those portions will be mentioned which bear directly upon the issue in the litigation. In discussing the capacity to which liquid petroleum tanks should be filled, Mr. Burns stated:

"* * * you have a mark there that you fill for butane, and you have a mark there that you fill for propane, and you have a mark that you fill for a combina-

tion of butane and propane. Normally standard practice which has been proven in the past to be safe, in the summer time, normally the summer months of the year, 90% is accepted as being safe, without going into calculation and without possibly referring to the liquid level gauge which could result in a mistake. They assume that 90% is the maximum and it has been proven from past experience that it would be safe under most conditions; in the winter time it is necessary to reduce that somewhat. I do know and I will say that they have in the past even during the winter months filled to 90% and has resulted in no complications, however, that was possibly due to the fact that the consumer was using gas off at that time. Should you fill one at extremely low temperature of 90%, then the temperature for some unknown reason was to raise up to 90 or 100 degrees, then you would be overfilled."

He stated that because of the fact that propane will expand about twice as much as butane, a tank will hold less propane than butane. Propane, as it is used for domestic consumption, is in a gaseous state. Liquid propane, when warmed from the temperature, will start boiling, and form a vapor pressure above it; the vapor pressure is removed from the regulator on the tank into the houseline, and on into the appliances. When asked what would cause the flame from the burner on Mrs. Charton's stove to shoot up 2½ feet into the air, Mr. Burns replied that such an occurrence would be caused by excess pressure in the service line. He then went on to say:

"* * * assuming that the appliance had the correct orifice, had the appliance operated previously with a normal flame, then the only thing that would naturally cause that would be an excess pressure which would have a tendency to force more gas through the orifice. * * *"

Burns then stated that this excess pressure in the service line could be caused by three things.

1. The malfunctioning of the regulator, or the hanging of a working or mechanical part in the regulator.

2. An accumulation of foreign material between the orifice and the regulator seat, preventing the regulator from closing.

3. The injection of liquid gas into the regulator. The witness testified that if the regulator was working properly, and there was no obstruction, "* * * then the only thing that would cause that would be liquid going into your regulator or gas in a liquid phase going into the low pressure side of your regulator, therefore vaporizing and increasing in volume which would necessarily result in an increase in pressure." He testified that he examined the regulator, and that it was working at the time of his investigation; however, this was some months later, and Mr. Burns stated this did not conclusively prove that the regulator was working properly on the day of the fire; that he had known of regulators that would fail to function for a while, but would subsequently start working again.

Appellees' contention is simply that the tank was filled too full, which caused the injection of liquid gas into the regulator; this, in turn, resulted in high pressure building up in the low pressure line, the latter not designed to take care of such excessive pressure, with the consequence that the various connections in the house which operated normally under normal pressure would leak when subjected to excessive pressure.

Appellants argue that, before appellees can prevail under any circumstances, it must first be shown that the tank was filled 100% full, while appellees, though contending that the tank was filled to that capacity, argue that it is only necessary that it be established that the container was filled to an unsafe capacity. Be that as it may, we are of the opinion that there was sufficient evidence to have justified the jury in finding that the tank was filled to 100% capacity. In the first place, the delivery ticket given to Mrs. Charton by Powell shows

that 135 gallons of propane were placed in the tank. It is somewhat difficult to accept the explanation that the ticket was only given to this appellee because she insisted she be charged for 31 gallons more than were delivered. Of course, it is even more difficult to see how 135 gallons of gas could be placed in a 115 gallon tank, but the point is that this evidence certainly establishes that Powell did not know enough about the operation of filling the tank to be reasonably certain of the amount placed in it. Aside from this testimony, let it be remembered that Mayall testified the tank was 10% full when he looked at the gauge around 11 a. m. in the morning. It would appear that the amount of cooking done from that time until the time the tank was filled, would have consumed but little gas. Of course, Powell stated the gauge rested on ''empty,'' but this conflict in evidence was simply a question for the jury to determine. If the tank was 10% full, there were 11½ gallons in it. If Powell placed 104 gallons in the tank, as he testified, then, at the time of the fire, it contained approximately 115½ gallons.

According to appellees' evidence, the capacity gauge on the tank on the morning after the fire registered better than 90%. Evidence on the part of appellants showed that the gauge registered 87%. As stated, witnesses testified that they saw flames shoot out of the top of the tank 12 or 15 times at the time of the fire[4] — and the house was practically completely burned when they arrived. Certainly, it is reasonable to assume that these flames ''shot up'' for quite some period of time before the witnesses arrived, and possibly for a while after they left. It would therefore appear that a large amount of gas would have been consumed at the time of the fire, and yet the capacity gauge still registered 87 to 90% full the next morning. This was certainly a strong circum-

---

[4] According to Mr. Burns, the shooting up of the flames indicated the operation of the pressure relief valve on the tank—the valve being set to go off when the pressure in the tank reached 250 pounds. The evidence reflected that the tank was 15 feet from the house, and Mr. Burns stated that, in his opinion, this was sufficiently close for the gas to catch on fire as it was released from the propane tank while the house was burning.

stance indicating that the tank was 100% full at the time of the fire.

While, of course, the violation of regulations is not such evidence of negligence as would establish liability, still evidence of violations, if pertinent to the cause, is proper for the jury's consideration in reaching its determination. One regulation of the Liquefied Petroleum Gas Board requires that an L. P. G. transport delivery driver must present satisfactory proof of on the job training for a minimum period of 30 days before taking an examination, which if passed, would qualify him for a license. As previously noted, appellant Powell had no license, and had only 1½ days training. Also, where the piping of the L. P. G. system has not been performed by a licensed and bonded butane dealer, then the dealer delivering the gas is required to advise the customer that he cannot fill the tank, until he, or some other qualified person, applies an air test to the line. According to Mrs. Charton, she requested that Powell check over the installation, but because of inadequate knowledge, he was unable to do so. Appellants complain that appellees' case is based upon speculation; yet, the dealer failed, as required by the aforementioned regulations, to report the fire within 24 hours. Instead, the report was made four months and 17 days later, and thus a proper investigation by the L. P. G. Control Board was precluded.

There was no evidence that the regulator was not properly functioning, or that there was an accumulation of foreign material between the orifice and the regulator seat. We think it significant that, according to the evidence, the stoves properly functioned prior to the filling of the tank. In *Biddle, et al., Receivers,* v. *Jacobs, supra,* the Court, quoting from a Missouri case, said:

"In actions for damages on account of negligence plaintiff is bound to prove not only the negligence, but that it was the cause of the damage. This causal connection must be proved by evidence, as a fact, and not be left to mere speculation and conjecture. *The rule does not require, however, that there must be direct*

*proof of the fact itself. This would often be impossible. It will be sufficient if the facts proved are of such a nature, and are so connected and related to each other that the conclusion therefrom may be fairly inferred."[5]*

We have concluded that there was substantial evidence upon which to submit the case to the jury.

The judgment is affirmed.

[5] Emphasis supplied.