## McHenry *v.* McHenry.

4-7868                                    193 S. W. 2d 321

Opinion delivered March 25, 1946.

*Sam M. Levine* and *Robert A. Zebold,* for appellant.

*Rowell, Rowell & Dickey,* for appellee.

SMITH, J.  Chester McHenry owned, at the time of his death, which occurred June 22, 1935, a 300 acre farm in Jefferson county.  He was survived by several children and grand-children, and by Julia his widow, who was his second wife, but not the mother of any of his children.  On September 2, 1922, he obtained a loan of $10,000 from the St. Louis Joint Stock Land Bank, which was secured by a deed of trust on the farm.  The loan was payable in semi-annual installments of $350 each, the last falling due in 1955, interest being included in the payments.

At the time of Chester's death a balance of $8,200 was due on the loan, which included three delinquent installments, which Chester was unable to meet, and a fore-closure of the deed of trust was threatened.  Chester's children had all left home and some were living in St. Louis, some in Chicago, and others in Detroit, and none were willing or able to render any assistance.  He had an ambitious and highly intelligent grand-son named Cleophus McHenry, who was given a good education and who lived with an aunt in Detroit while attending Wayne University in that city.  Cleophus had received expense money from Chester, his grandfather, who wrote him to return before completing his schooling, to take charge of the farm.  His grandfather was in bad health and died a few days after Cleophus returned home.  All the family had left the farm except Chester's widow, with whom Cleophus resided until 1944, when she too left the farm, but did not take her personal effects with her.

Cleophus was confronted, when he returned home, with a very difficult situation.  There was no money to pay the delinquent installments due on the mortgage debt, and payment was being demanded.  The houses were in bad repair, there was Johnson grass on the farm, the equipment was poor, and there was an insufficiency of live stock to properly cultivate the land.  The testimony is conflicting as to the value of the farm when Cleophus took charge of it.  There was testimony that it was worth

no more than the debt due on it. However, a planter owning a 6,500 acre plantation adjoining this farm, placed the value at from fifty to sixty dollars per acre at that time. In 1937, 167 bales of cotton were produced on the land. Cleophus applied to several persons and agencies for assistance, but was told that it could not be given, unless he acquired title to the land. He wrote his relatives explaining to them his desperate plight, but no one of them was able or willing to lend any assistance, By correspondence and by personal visits he obtained deeds from all the heirs, except three who refused to execute deeds, which deeds with his own interest, gave him the apparent title to 19/24th interest in the land.

With these deeds Cleophus was able to obtain the necessary line of credit with which to operate the farm, and with its proceeds bought the tools and stock needed, and he put the houses in good condition, and has now an up to date and well equipped farm.

This suit was brought by the widow and the heirs who had executed these deeds to cancel them, and from the decree granting the relief prayed is this appeal., it being alleged that the deeds had been obtained ''through misrepresentation and with fraudulent intent.''

The plaintiffs testified in effect that Cleophus represented to them that it would be necessary for him to have the title in himself individually, in order to operate the farm, and to raise the money necessary to pay the delinquent installments due on the mortgage, and to pay other installments as they matured, and thus save the farm for the heirs. Cleophus denied this, and testified there was no agreement that he should not take the title which the deeds purported to convey, and that but for these deeds he would not have undertaken the arduous and what appeared to be almost impossible task of redeeming the land from the mortgage.

Much testimony was taken orally, and at the end of the first day of the trial there was found a writing which was offered in evidence on the second day of the trial, which writing the widow testified had been in her pos-

session since its execution, but had been misplaced. This instrument reads as follows:

"In consideration of the conveyance to me of the Chester McHenry tract of land in Jefferson county, Arkansas, by certain of the heirs of the said Chester McHenry, I hereby agree that I shall operate and cultivate the said lands until the indebtedness now on said lands will have been canceled and paid off, including any additional indebtedness which will have accrued for building or re-building of houses and making of repairs and improvements on said farm, with the understanding that when all of such indebtedness will have been paid I shall have all the rents and profits derived from the operation, cultivation and use of said lands for a period of five years thereafter, and at the expiration of such period of time, I agree to divide up the rents and profits derived from said lands, among the respective heirs according to the proportionate amount due each as the heirs of Chester McHenry.

"The above agreement is conditioned especially and absolutely on the understanding that as long as Julia McHenry lives and I continue to hold the title to the aforesaid property she shall be privileged to live on the said place and be maintained therefrom.

"Dated this 28 day of November, 1938.

"(Signed) Cleophus McHenry."

When this writing was produced Cleophus was asked if he had signed it, and he answered, "I deny it definitely." But when it was proposed to call witnesses to prove his signature his attorney said, "We will admit the signature."

The complaint was then amended to allege that if Cleophus had not acquired the title through fraud, he had acquired it as a trustee for the McHenry heirs, and had unfaithfully repudiated the trust. The heirs had called on Cleophus for an accounting of his trusteeship in 1944, and when he stated that they had no interest in the land, but had conveyed their respective interests to him, this suit was filed.

All the heirs testified that the consideration, and the only consideration for the deed was Cleophus' agreement to operate the place and pay it out of debt, and save it for the heirs. After the execution of the instrument above copied was established by admission, Cleophus stated that it had been executed for the benefit and protection of his grandmother only, and not for the benefit of the other heirs. But it does not read that way, and letters written by Cleophus to other members of the family show that it was not so intended or understood. For instance, in a letter dated November 27, 1938, to one of his aunts, Cleophus wrote, "I have done my best to pay the place out, but I can't do it unless they are willing to sign these deeds and let me refinance it. Cottrell (a grandson of Chester) thinks they will sign them, so that we can save it. . . . I will have the contract and quit claim deeds drawn up if they want to sign them, I am going to see that St. Louis man today. Our time is up."

The deeds, three in number, referred to are dated as follows: one, December 17, 1938, another December 19, 1938, and the other December 20, 1938.

It is conceded that inasmuch as these deeds are absolute in form, and apparently conveyed the title to the land they described, the testimony must be clear, cogent and convincing to cancel them, and to permit the showing that their intention was and their effect is to create a trust. But the Chancellor found that the testimony met this requirement, and we concur in that finding. *Ripley* v. *Kelly,* 207 Ark. 1011, 183 S. W. 2d 793.

Now the agreement above copied, which evidences the trust, provides that Cleophus should have the rents and profits of the land for a period of five years, after he paid the mortgage, but it may be answered that he has not yet discharged the mortgage, although he had all the rents and profits, including Federal Government parity payments in the sum of $3,452.65. A balance of $5,447.49 remained unpaid when Cleophus made his last payment on the mortgage indebtedness.

It may be further said that Cleophus repudiated the trust and has compelled the heirs to prosecute extended

and expensive litigation to establish it. Moreover, Cleophus has had substantial compensation for his services, which no doubt, saved the farm for himself, and the other heirs. The decree did not require him to account for any rents prior to 1945, the year in which the suit was filed, and he was allowed to keep the large amount of valuable, personal property now on the farm, which he had accumulated during his operation of the farm, and of that part of the decree the heirs make no complaint.

At § 840 of the Chapter on Trusts, 65 C. J., p. 929, it is said: "Generally speaking, a trustee who neglects his duties, or who is guilty of bad faith, or who violates his obligations, or who repudiates the trust, claiming title as absolute owner, forfeits his right to compensation, from the date of his default, and independent of any provision for compensation in the trust instrument itself."

The original decree allowed a fee of $1,000 to the attorneys for the heirs who had brought and prosecuted the suit under the authority of § 10531, Pope's Digest. This section provides that in suits for partition of lands, it shall be lawful for the court rendering the decree ordering partition to allow a reasonable fee to the attorney bringing the suit, which fee shall be taxed as part of the costs, and be paid pro rata as the other costs are paid, according to the respective interests of the parties to said suit in said lands so partitioned. But when the attention of the court was called to the opinion of this court in the case of *Lewis* v. *Crawford,* 175 Ark. 1012, 1 S. W. 2d 26, that allowance was rescinded, and no fee was allowed, and from that part of the decree a cross appeal has been prosecuted by the heirs. We think the fee was properly disallowed. Strictly speaking, this was not a partition suit, but one to cancel deeds and establish a trust and partition was a mere incident.

We conclude therefore that the decree should be affirmed both upon the direct and cross-appeal.