HIATT v. HIATT.

4-8368 · 206 S. W. 2d 458

Opinion delivered December 15, 1947.

*Festus O. Butt*, for appellant.

*Daily & Woods*, for appellee.

SMITH, J. This appeal is from a decree, entered in a suit brought by appellee, cancelling certain conveyances whereby appellant and appellee became owners of appellee's home in the City of Fort Smith, as tenants by the entirety. They were married October 25, 1945, at which time appellee was 80 years old, and appellant was 50. It was appellee's third marital venture and appellant's second.

Before the marriage a marital contract was entered into whereby each relinquished any and all claims against the estate of the other. The consideration for the contract, in addition to the marriage, was the payment to appellant of $500 in cash, and the agreement that there should be paid to her $3,500 as a first claim against appellee's estate, if she survived him, and that she should also have appellee's automobile, if he owned one at the time of his death. By mutual consent this contract was abrogated and set aside on November 24, 1945.

The testimony on appellee's behalf was that he was very fond of and proud of his wife, but that she was less affectionate to him. There is no testimony that they had any serious quarrels or disagreements, and appellee's chief complaint against his wife is that she neglected him and spent too much time away from him. On one occasion she took a business trip with a lady friend which carried her into the State of Missouri. They spent about a week on that trip. Another was to Hot Springs with the same lady, which lasted somewhat longer. Appellant owned a home in the City of Eureka Springs where she lived with her mother, and she owned some lots in Missouri. Appellee's financial condition was much more effluent than that of appellant.

Appellee owned a home in the City of Fort Smith for which he had paid $7,250, and on May 3, 1946, certain conveyances were executed which operated to vest the title of this home in appellant and appellee as tenants by the entirety, and the purpose of this suit was to cancel these deeds.

The parties went together to the office of a Mr. Wren, a Notary Public, who apparently prepared the deeds and took the acknowledgments thereto, his secretary being the conduit through which the title vested in appellant and appellee as tenants by the entirety. Appellant testified that she did not know Mr. Wren, but was introduced to him by appellee, who did know him, and was known to him. Wren did not testify and the record is silent as to the explanations made to Wren to enable him to prepare the necessary papers. Appellee carried the deeds to the office of the recorder of deeds, and they were recorded. Copies of these deeds were introduced by consent. These are the deeds which this suit seeks to cancel.

Appellee's health was not good, and he was very nervous and as his condition did not improve he requested his son, who resided in Charleston, and was the cashier of a bank there of which appellee was president, to take him to a hospital in Charleston, operated by appellee's son-in-law. Appellant did not accompany appellee to the hospital, her explanation being that her mother with whom they were living in Eureka Springs, was sick at the time, and that she herself was quite ill. A doctor testified that appellant was under his treatment from June first, until after the first of September, during which time appellee was in the hospital, and that during that time appellant was unable to nurse anyone as she was undergoing her menopause, and was in a nervous condition, suffering also from a badly infected sinus and from arthritis. On his cross-examination the doctor was asked if he had not had relations, not professional, with the appellant. No testimony was offered giving any basis whatever for the question, and the doctor denied the existence of any such relations. Appellant testified that although she was unable to visit appellee in the hospital, she wrote him a number of letters, but none of them was answered. These letters were no doubt available to appellee, but none of them was offered in evidence. Appellant testified that she finally concluded that her letters were not being delivered to appellee, and she wrote a letter to appellee's brother-in-law, enclosing a letter to appellee, which she requested the brother-in-law to deliver.

It was delivered and it is admitted that the other letters had also been received.

The testimony is that prior to, during and subsequent to appellee's confinement in the hospital, he complained to his friends that his wife was neglecting him, and he appears to have become more nervous and resentful of the neglect of which he frequently complained. He lost weight and did not improve under the treatment at the hospital. There is no testimony that the question of divorce had ever been discussed before appellee left for the hospital, and appellant testified that the first intimation that she had that appellee wished a divorce was when appellee's son so advised her. This son, accompanied by his own son, went to Eureka Springs and found appellant was not at home, although her mother was, but she was not out of the city, and he carried his father to the hospital in a truck.

This witness testified that appellee complained much of appellant's neglect of him and that he did not know she had gone to Hot Springs until her return, and that while in Hot Springs appellant drew a check against appellee's bank account, of which fact witness apprised his father. This occurred, however, before appellee was taken to the hospital. This witness further testified that his father was very proud of his wife and introduced her to everybody and "he talked that way to the immediate family," and he stated that as far as he could tell, her attitude was good towards her husband.

On the second trip to Eureka Springs the witness saw appellant's attorney and advised him that his father wanted a divorce and was desirous of settling his affairs, and the attorney told him to see appellant herself. He did so, and concerning that interview he testified as follows:

"Well, in the conversation she was very courteous and very nice, but in the conversation it was brought up that perhaps a divorce should be gotten and in the conversation she said, 'I did not marry your daddy for love,

I married him for money. If I had married for love I would have had a chance of several younger fellows.' ''

This witness was accompanied by his own son on this visit and in corroboration of the testimony of his father, the son testified that appellant told his father that she had married appellee for his money and his property and that if she had married for love she would have taken a choice of three or four younger men.

A niece of appellee testified that she visited her uncle on one occasion and found him very nervous and restless because appellant was not at home, but she returned before the niece left. That he was very fond of and attentive to his wife, but she was indifferent and inattentive to him. This witness's husband gave testimony to the same effect.

Dr. Bolinger testified that his wife was appellee's niece and that he operated the hospital in Charleston to which appellee was brought. He was asked about appellee's condition while a patient there, and he stated that appellee was highly nervous and in no condition to transact business during that time. When asked about appellee's condition before coming to the hospital, he answered that he did not know and he did not testify that appellee's condition while at the hospital was such that he would not realize and understand what he was doing. In this connection it may be said that no witness testified that appellee's mental condition was such that at any time he did not know and realize and comprehend what he was doing and the decree from which is this appeal is based upon other grounds, it being recited in the decree that the deeds are cancelled on the grounds of ''fraud and undue influence.''

This suit is predicated upon the allegation that appellant won appellee's affection and betrayed his confidence, that she married him only for the purpose of acquiring as much of his estate as possible, and that when this purpose had been accomplished she thereafter pursued such a course of conduct toward him as to render his condition as her husband intolerable, thereby compelling him to sue for a divorce.

The decree cancelling the deeds, creating an estate by the entirety in appellee's home, summarizes certain testimony which, if it did not control the decision, was certainly not disregarded. The most important of this testimony was given by one Lee Gates and his wife. Gates testified that he lived in a rent house behind appellant's home and he described himself as a land surveyor engaged in mowing lawns. He testified that one day between sundown and dark he and his wife went downtown, and in going by appellant's home saw a man standing on the back porch. He and his wife returned home about 10 p. m. and in doing so they again passed appellant's home. The lights were out except in the bedroom, which he supposed was appellant's. He saw appellant and a man in the room, who were just sitting there in the bedroom talking and when asked how close together they were sitting answered that they were "in each other's laps," but that he did not stop at all to look. His wife corroborated this testimony, and it was apparently credited by the learned Chancellor, but we do not credit it. If the witnesses saw what they testified they did see, it is highly improbable that they "did not stop at all to look." If the testimony is true, appellant is a strumpet without modesty, and there is no testimony giving her that name or reputation. Gates and his wife testified that an electric light was burning in the room and they could see from the street what was happening in the room.

It was shown by undisputed testimony that this night was the only night appellee was away from home after his marriage, he having gone to Charleston to witness the graduation of his grandson. Appellant testified that a man came to the house that night, the man being appellee's nephew and that he came to the back rear door because the front door had been freshly painted, and was roped off; that she invited him in and he remained there only a short time, not exceeding twenty minutes. The housekeeper was there at the time in an adjoining room, and she and a lady who was spending the night with appellant gave testimony to the same effect. However, Gates and his wife did not disclose what they had seen.

Mrs. Gates testified that she did not tell anyone about what she saw until the day before she testified, when she told appellee's son. Mr. Gates had disclosed his information only a day earlier. Mrs. Gates further testified that she had done housecleaning work for appellant on four or five occasions and that on one occasion appellant said 'to her, ''I wish the old devil (meaning appellee) would die and get out of my way.'' Witness said, ''What did you marry him for?'', and appellant answered, ''To get what he had, his money and his property,'' and witness said, ''I would hate to wish anybody anything like that.'' .It is difficult to believe that appellant was so callous as to make a remark of that kind to a servant who was only occasionally and incidentally employed. Needless to say appellant denied making the remark.

Other testimony referred to in the opinion of the Chancellor related to two letters which appellant had written to an elderly gentleman who had apparently addressed appellant on the subject of marriage. In one of these letters she stated that she had married one old man from whose estate she had received but little, and that she did not intend to marry another who had given the principal part of what he had to his daughter. These letters were written some months after the divorce decree had been rendered, and were admitted in evidence on the theory, as stated by appellee's counsel, that they tended to show that appellant was a ''gold digger.''

Appellant denied that she had neglected appellee and stated that only on two occasions had she been absent from home, and both times on business and that her husband knew when she went and why she was gone. She made both trips with a lady friend who was engaged in selling commercial advertising and that her first trip, lasting about a week, was extended to enable her to go to Missouri to see about a house she owned there. The second trip of somewhat longer duration, was made with the same lady, and on this trip they went to Hot Springs where appellant sought to perfect her discharge from service as a WAC, in which she had enlisted at the beginning of the war. She testified that she had made appel-

lee a dutiful wife, and she and her mother testified to numerous acts of unrequired attention which appellant performed consisting largely of the preparation of certain foods of which appellee was fond. She denied that she sought a divorce or wanted one, or that she inveigled appellee into marrying her, but that to the contrary, she declined his offer of marriage more than once on account of the disparity in their ages, and consented only when members of appellee's family urged her to marry him, a statement which was not denied, and when she agreed to marry appellee they signed the marriage contract under which she agreed to accept much less than the value of her dower interest would have been had she married and survived appellee.

Appellant denied ever having told anyone that she did not love appellee and had married him only for his money, and she testified that she had no thought of divorce until appellee's son came to see her and told her that his father wanted a divorce. She testified that appellee's son brought this news to her by saying: ''I have come here to lay my cards on the table and make a settlement with you, but first I want you to know that dad is broke,'' and appellant said, ''That is strange. He did have plenty. Have you spent it?'', and he said, ''No,'' and appellant told him of various interests he had, but he said, ''I know he had that but it is gone.'' Appellant said, ''I am glad you talked to me about it because you would always think I got it, and I would think you got it,'' and he said, ''We have to get together on this,'' and said, ''Pa doesn't have anything''; and he says, ''You didn't love him.'' He said, ''He loved you, but you just married him for money, but I don't blame you. After all, it was a business proposition on your side of it.'' ''And I never said a word.''

Appellant consented that appellee might have a divorce if he wished one, although she did not want a divorce, and the matter thereafter appears to have been referred to the respective attorneys of the parties. Appellant's attorney wrote appellee's son a letter in which he stated that appellee had left certain clothing at appellant's home which would be sent to him, and requested

that certain personal effects belonging to appellant which had been left in the Fort Smith home be sent to her. In the same connection it was stated in the letter from appellant's attorney to appellee's son:

"To keep matters on a purely business basis she advises that so long as you wish to use the home there it is agreeable to her, without any claim by her for rental; but if your plans are not to occupy the place, and it appears more desirable to rent it, that sole handling of the property would be left to you, but that she would, of course, expect to receive half of the rentals."

Suit for divorce was filed by appellee and by agreement was not contested, and the divorce decree recites that a property settlement had been effected. This agreement effecting a property settlement was offered in evidence by appellee's son and when asked where he had obtained it, answered, "If my memory serves me right, from the hands of his (appellee's) attorney." Appellee's son testified that he read the property settlement agreement to his father and that "I explained to him that it was the property settlement, that the money he had given Queen (appellant) and those other things in the way of rings and stuff like that was to be hers and the car was to be hers and in addition to that he was to pay her $3,500 and for that she was releasing——," the sentence was not completed, but other testimony of witness would have completed the sentence by saying that she released all claim to any other part of the property. He testified that he did not know his father had executed the deeds hereinbefore referred to relating to the home. Confirmation of the deeds here in question was not recited in this instrument and witness testified that the instrument was understood to confirm the gift appellee had made appellant including the money he had given her when she sold her old home in Eureka Springs and had bought another and in addition the car and the $3,500 for which the original marriage settlement had provided.

Appellee testified that his physical condition was such that he did not understand the property settlement except as it was explained to him by his son, but what-

ever the facts may be as to the understanding of the parties as to the purport and effect of the property settlement, it formed the basis of the divorce decree in that respect and it is certain that the decree did not undertake to divest appellant's title to the interest in the homestead and it was necessary to institute this suit because it did not.

We have recited much of the testimony because we are not in accord with the opinion of the learned Chancellor as to his findings of fact that the deed to the interest in the homestead had been obtained by fraud and undue influence. Based upon that finding the court below held that the opinion of this court in the case of *Harbour* v. *Harbour,* 103 Ark. 273, 146 S. W. 867, controlled and the relief prayed was granted. There are controlling points of difference which make the instant case more similar to that of *Biddle* v. *Biddle,* 206 Ark. 623, 177 S. W. 2d 32.

Appellee has not been denuded of substantially all his property or a major part thereof. In fact, except for the interest in the homestead and the advance to enable appellant to buy her new home in Eureka Springs, in which they were living when appellee was carried to the hospital, appellant has gotten only about what she would have obtained under the marriage contract, had she survived appellee. We do not find that appellant was entirely free from guile. There is usually but little romance in the marriage of an old man needing a nurse, and a woman much younger wanting a home. It is true that the Harbour case and other cases hold that notwithstanding a previous divorce decree may have failed to adjudicate the question of fraud that question may be adjudicated in subsequent litigation, yet it is always required that fraud be shown. It was said in the Biddle case, *supra*:

''The record here wholly fails to present clear and convincing evidence of a fraudulent plan or scheme on the part of appellant to obtain the property of the appellee through a simulation of an affection for him which she did not feel. The very most that could be said in this regard is that some of the facts disclosed by the record

induce a suspicion that appellant's attitude toward appellee was prompted by motives which were not entirely free from guile. Such evidence is not sufficient to support a finding of fraud, . . . ''

There is no showing of any plan or purpose on appellant's part to obtain appellee's property or any considerable part thereof, and then to divorce him. On the contrary appellant did not seek the divorce and the uncontradicted testimony shows that she was opposed to it. Appellee's son, who appears to have been in charge of the divorce, was advised in writing that appellant saw no reason for a divorce, and did not want the divorce, and the testimony refutes the contention that any undue influence was exerted to procure the execution of the deeds which have been cancelled. Appellant admits that she asked appellee if he did not think it would be right for him to give her something that would be a home, but she testified that she did not insist that this be done. In fact, when the deeds were executed giving her an interest in the homestead, that interest was not given her in severalty but as a tenant by the entirety, and it was shown and not disputed that she consented that appellee might occupy the home without paying rent, but it was stipulated in the letter above quoted from that if he did not occupy the home, but rented it, that she should have one-half the rent. There was but little, if any guile in this demand.

Appellee professes to have been unaware that he was deeding an interest in his home and that he had no such intention, but his own testimony refutes this contention. He testified as follows: ''Q. You would not have thought of deeding that home away, I take it? A. Why—Deed my home away?—Of course not. Q. As a matter of fact. your wife never asked you to do that? A. Well, she talked about it. Q. You had discussed it? A. I think so. Some—not a great deal. Q. What was your attitude in talking to her about it? A. I don't know, Judge.—I don't know. Q. You don't know what you may have said? A. No.''

Yet appellee took his wife to a scrivener of his own selection, unknown to his wife, but known to him, and had the deeds executed, and after they had been executed and

recorded he kept them in his own possession, locked in a safe.

We think the proof fails to show by ''a preponderance of the evidence which is clear and convincing'' which the Biddle case held the law requires, that a fraud had been practiced upon appellee in procuring the execution of the deeds. It was said that the same degree of proof was required to cancel an instrument duly executed and recorded in the later case of *Barnett* v. *Morris,* 207 Ark. 761, 182 S. W. 2d 765; *Eaton* v. *Humphreys,* 209 Ark. 525, 190 S. W. 2d 973; *McHenry* v. *McHenry,* 209 Ark. 977, 193 S. W. 2d 321.

The decree of the court below will therefore be reversed and the cause remanded with directions to vacate the decree from which is this appeal and to dismiss the complaint.