FORT SMITH GAS COMPANY v. BLANKENSHIP.

4-4543

Opinion delivered March 1, 1937.

*Miles, Armstrong & Young,* for appellant.

*R. E. Hough, T. N. Taylor* and *Fines F. Batchelor,* for appellee.

BAKER, J. This appeal is from a judgment in favor of Danny Hugh Blankenship, a child five months old, in the sum of $287.50 for damages.

It was alleged in the complaint that F. J. Reichart resided at 1001 south Eleventh street in Fort Smith and that his daughter, Mrs. Retha Blankenship, and her infant child, resided with him at that place.

On February 17, 1936, the gas company cut off or disconnected the gas from Reichart's home about 10:00 o'clock in the forenoon and did not reconnect or turn on the gas till about 2:00 o'clock in the afternoon. It was a very cold, raw day with flurries of snow.

That part of the complaint with which we are here concerned is as follows:

"That by reason of the gas being shut off from the home of F. J. Reichart in which Danny Hugh Blankenship at the time was living and thereby leaving said house cold, damp and without any heat or warmth whatsoever, and leaving no means of cooking or preparing said child's milk or food at a time when said child was sick and ill and his body inflamed with cold and fever, said child became violently ill and his body was chilled and made cold, thereby aggravating his present and already existing grave condition to the extent that same resulted in pneumonia, seriously and dangerously injuring said child in the sum of $2,000.''

It was shown by appellant, and not controverted by appellee, that Reichart was in default in the payment of his gas bills. The January bill was for $6.40 and this included forty-two cents unpaid on the December bill. This was not paid when due on January 10. The bill on February 10th was $7.07. On February 17, 1936, there was still due on the January bill $1.84. Notice of the delinquency was sent to Reichart on February 5. He says he "did not notice it." This notice advised service would be discontinued for nonpayment.

Mrs. Reichart testified she worked near the gas office and usually paid the bills. She went to the office on February 14 and promised to pay on the 15th. She in fact paid the balance due of $1.84 on the morning of the 17th. She is very positive this payment was made at 9:15. The daughter, who was at home, says gas was cut off at 10:25. There was some dispute about the exact time of the cutting off of the gas. The jury might well have found, and no doubt did determine, that the gas was disconnected after the payment had been made.

In this connection, it is pertinent to remark that F. J. Reichart sued for $500 damages for this alleged breach of duty, but recovered nothing. His grandchild recovered $287.50. The difference between the two plaintiffs, as treated by the parties, was the effect or resulting consequences of the alleged wrongful discontinuance of service for a period of about or nearly four hours. Reichart was away from home, but returned about 10:45; the house

was not cold; the baby was in bed. He (Reichart) was there till the gas was reconnected.

But a much more elaborate story is told about little Danny Hugh. His grandmother says he had been sick about a week before the 17th with "flu" and a cold. They called Dr. Southard about February 20. The doctor made one call and the child was carried to the doctor's office once or twice. The child was sick about two weeks. Mrs. Blankenship says the gas was turned off about 10:25. She waited about thirty minutes for the man to return and restore the service. She wrapped up the baby and put him in bed. The weather was cold that day and the child had a cold and was fretful; in a day or two he got worse and was sick for about two weeks. He had proper nourishment. The child had had "flu" for a week. She took him to a neighbor's about three blocks away. "When I took the child out it caused him to take bronchitis." She wrapped him up well because she didn't want him to get any sicker than he was.

The only other testimony was by Dr. Southard as follows: "Q. Doctor if a child left in a house without heat and when the temperature was around 7 degrees above and snow on the ground, would that case turn into bronchitis? A. Yes, sir."

He made one call to see the child and about two weeks later it was brought to his office. It was then improving. There was no bad after effects. Bronchitis is a common disease with babies. It did not have any other illness except bronchitis; couldn't tell how long he had had it. It wasn't severe enough to go back.

"Q. What other things besides exposure would cause bronchitis? A. They just take it sometimes. Q. If the child had been left in an unheated house, that would not have produced bronchitis, would it? A. No, sir. Q. That is, if she had been properly clothed? A. No, sir.

"REDIRECT EXAMINATION.

"Children have colds without taking bronchitis.

"Q. If a child was left in an unheated house when it was 7 degrees above and would have to be carried in the snow, would that have caused it? A. I couldn't say what caused it. If the child had been left in a creek that

might cause it and might not. Q. From your observation of this case, is that what caused it? A. I couldn't say, I couldn't say about that as to what caused it. Q. Does exposure always cause it? A. No, sir. Improper nourishment and rickets also cause bronchitis. I didn't see anything from my visit to show that the child was undernourished. Q. What is something that would cause it? A. I didn't say anything in general that would cause it to take it; nothing only exposure. Q. You do say that that is the cause? A. I couldn't say that; I only saw it once.''

We have set out in detail this testimony, and without extended comment suggest that the jury could not determine that the discontinuance of the gas service caused this illness or aggravated it. About thirty minutes after the gas was cut off the child was wrapped up and carried to the neighbor's home. The mother urges this excursion outside caused the trouble. The doctor did not agree to this theory. In fact, he did not know the cause of the trouble.

We have been taught to defer to the physician in a matter so peculiarly within his realm, and so far outside of the common or ordinary knowledge of the laity. He was better prepared to understand.

How did the jury reach its verdict? Certainly not from a consideration of what Dr. Southard said. The gas was disconnected when the child was sick, the house began to get cold, the mother then wrapped up the baby and took it to another home. A day or two later the child grew worse, afflicted with a disease common to children and which they take without apparent cause. We cannot understand how the jury can be more certain than the doctor. The indulgence of inferences will not supply a nonexistent fact. Inferences to support a verdict arise out of facts established by evidence. Other inferences are purely speculative, or maybe guesswork or conjecture. This method of dealing with the rights of parties has been condemned by many decisions. *Standard Pipe Line Co.* v. *Burnett,* 188 Ark. 491, 66 S. W. (2d) 637; *St. Louis, I. M. & S. Ry. Co.* v. *Hempfling,* 107 Ark. 476, 156 S. W. 171; *Denton* v. *Mammoth Spring E. L. & P. Co.,* 105 Ark. 161, 150 S. W. 572; *Ft. Smith Light & Traction Co.* v. *Cooper,*

170 Ark. 286, 280 S. W. 990; *Turner* v. *Hot Springs Street Ry. Co.,* 189 Ark. 894, 75 S. W. (2d) 675; *Lewis* v. *Jackson,* 191 Ark. 102, 83 S. W. (2d) 69.

A consideration of the sound principles announced in the above-cited cases and of many other similar authorities impels us to hold the court erred in failing to direct a verdict for the defendant upon this matter.

We pretermit a discussion of the alleged negligence of the appellant and reasonable regulations in the conduct of its business for the reason it has not been made to appear that evil consequence resulted therefrom.

The case has been fully developed; therefore, for the error indicated, it will be reversed and dismissed.

HUMPHREYS and MEHAFFY, JJ., dissent.