**HEEKIN CAN COMPANY, Plaintiff,**

v.

**W. Bradley KIMBROUGH and The Lawrence Warehouse Company, Defendants.**

**Civ. A. No. 1559.**

United States District Court
W. D. Arkansas,
Fort Smith Division.

Aug. 17, 1961.

Crouch, Jones, Blair & Cypert, Springdale, Ark., Kyte, Conlan, Wulsin & Vogeler, Cincinnati, Ohio, for plaintiff.

Daily & Woods, Ft. Smith, Ark., Charles O. Butler, Chicago, Ill., for defendants.

JOHN E. MILLER, Chief Judge.

The plaintiff, The Heekin Can Company, is a corporation organized and existing under and by virtue of the laws of the State of Ohio and qualified to do business in the State of Arkansas.

The defendant, The Lawrence Warehouse Company, is a corporation organized and existing under and by virtue of the laws of the State of California and qualified to do business in the State of Arkansas.

At all times material to the issues in this case, the plaintiff was engaged in the business of manufacturing and selling metal containers for the food canning industry, and regularly sold on credit and without security substantial quantities of such containers to the Ozark Packing Company, Ozark, Arkansas, hereinafter referred to as "Ozark."

Likewise, at all times material herein, the defendant, The Lawrence Warehouse Company, hereinafter referred to as "Lawrence," maintained a bonded warehouse on the premises of Ozark.

The defendant, W. Bradley Kimbrough, was the president and manager of Ozark, an Arkansas Corporation with its principal place of business at Ozark, Arkansas, which was engaged in the business of processing and canning beans, peas, potatoes, etc.

On November 30, 1959, the plaintiff filed its complaint against the defendants in which it sought to recover judgment against the defendants for the sum of $20,153.23, with interest thereon from February 24, 1958, a reasonable attorney's fee and its costs.

In its complaint the plaintiff alleged that the warehouse facility was established on the premises of Ozark prior to January 1, 1955; that the said warehouse was at all times operated and managed by and under the complete control of Lawrence, and the duties of Lawrence as operator of the warehouse consisted of "receiving into said warehouse such goods and material of the Ozark Packing Company as said company elected to store therein, of counting and recording the exact amount of the goods and materials so received, of issuing in its name receipts, generally known as warehouse receipts, representing the exact amount of the goods and materials so received, of maintaining accurate records as to all goods and materials received into said warehouse and as to all warehouse receipts issued therefor, of taking all necessary measures and precautions to safeguard and secure all goods and materials stored in said warehouse, and of discharging or releasing from said warehouse any of the goods and materials stored therein only upon the presentment to it of the receipt or receipts issued by it and representing such goods and materials."

That the defendants during the years of 1954–1957, inclusive, conspired to effect and through their concerted actions did effect a scheme to defraud the creditors and prospective creditors of Ozark, among whom was this plaintiff. That the alleged conspiracy and scheme to defraud was effectuated by the defendants in the following manner:

"(a) By issuing warehouse receipts which were not in fact represented by goods received into the warehouse facility maintained on the premises of the Ozark Packing Company.

"(b) By releasing from said warehouse facility goods for which warehouse receipts had been issued and were outstanding, the existence of such warehouse receipts being well known to said defendants, without the presentment of said outstanding warehouse receipts.

"(c) By pledging and hypothecating the spurious warehouse receipts referred to in paragraphs (a) and (b), above, and obtaining therefor cash and credit by which said defendants intended to and did maintain and keep in operation the Ozark Packing Company when said company was, in fact, completely insolvent.

"(d) By procuring the preparation of and causing the issuance of financial statements of the Ozark Packing Company which reflected the aforesaid spurious warehouse receipts.

"(e) By holding the Ozark Packing Company out to the public in general and to its creditors in particular as a solvent, going concern.

"(f) By actively concealing the insolvency of the Ozark Packing Company when it was, in fact, completely insolvent.

"(g) By utilizing the foregoing manifestations of financial soundness to induce persons to extend credit and make sales on credit to the said Ozark Packing Company at a time or times when full payment of the credit so extended was not possible, which fact was known to these defendants.

"(h) By keeping the Ozark Packing Company in business long after said company would, in the normal course of business, have ceased to operate."

The plaintiff further alleged that as a result of the effectuation of the conspiracy and scheme of the defendants, the following representations were made to the plaintiff and to that class of persons of which the plaintiff was a member:

"(a) The records of the Ozark Packing Company and the financial statements prepared therefrom showed the existence of pledged assets, represented in large part by spurious warehouse receipts issued by the defendant, Lawrence Warehouse Company, of many thousands of dollars which did not in fact exist.

"(b) The Ozark Packing Company was enabled to issue and did issue financial statements to this plaintiff showing a financial condition which was totally false.

"(c) The hopeless insolvency of the Ozark Packing Company was actively concealed from this plaintiff, even though it requested financial information from said company; and said company was kept in operation and purchased goods and services on credit from this plaintiff long after it would, in the normal course of business, have ceased to operate.

"Plaintiff further states that all of such representations were made by said defendants pursuant to and as a result of the aforesaid scheme; that said defendants knew that such representations were false at the time or times they were made; and that such representations were made to this plaintiff with the intention that this plaintiff should rely thereon."

That the plaintiff relied upon all of the alleged false representations of the financial soundness of Ozark, and continued to deal with Ozark, "and extended a line of credit to said company, which in the absence of such representations, it would never have done; that the continuance of such course of dealing and the extension of such line of credit was the direct result of, and would not have come about but for the fraudulent scheme of the defendants, acting jointly and in concert; and that such credit extended (on the sale of cans to the Ozark Packing Company) exceeded payments made to it by the Ozark Packing Company by the amount of $20,153.23 on that date in February 1957 when said company ceased its operations."

Prior to the filing of the instant suit, the plaintiff had on May 28, 1958, obtained a judgment against Ozark for $20,-153.23, with interest from February 24, 1958. An execution issued on said judgment was returned nulla bona.

Prior to the commencement of the instant suit, the defendant, W. Bradley Kimbrough, had become a citizen and resident of the State of Louisiana and no service of summons was had on said defendant.

On December 24, 1959, Lawrence filed its answer in which it admitted the allegations of citizenship of the parties and that the parties were engaged in the operation of the businesses as alleged by

plaintiff, but alleged that the agreement entered into between it and Ozark did not involve the presentment to it (Lawrence) of any receipt or receipts by the holders thereof upon the delivery from the warehouse of any goods or commodities covered by such receipts; that all warehouse receipts issued by it from time to time were nonnegotiable in character, and that under the laws of the State of Arkansas it was not required that said warehouse receipts be surrendered or presented to this defendant by the holders thereof upon the delivery of the goods and commodities covered by such receipts from the warehouse; that it was authorized by law, as contemplated by the warehouse agreement, to deliver goods and commodities covered by said warehouse receipts upon releases duly executed by the holders of said warehouse receipts and that this practice was followed by it at all times in the operation of the warehouse.

All other allegations in the complaint were denied by Lawrence.

On August 5, 1960, the plaintiff, after obtaining leave of court, filed an amendment to the complaint by adding Count II following paragraph 8 of the original complaint, and alleged that Lawrence was negligent and grossly negligent in that:

"1. That the defendant, the Lawrence Warehouse Company, was negligent and grossly negligent in issuing warehouse receipts on goods allegedly owned by the Ozark Packing Company when said warehouse receipts were not in fact represented by goods and materials from the warehouse of the Lawrence Warehouse Company, without demanding and receiving a warehouse receipt therefor.

"2. That the defendant, the Lawrence Warehouse Company, was negligent and grossly negligent in allowing goods and materials of the Ozark Packing Company stored in said warehouse to mysteriously disappear in a manner unknown to the plaintiff but well known to the defendant, the Lawrence Warehouse Company, and was further negligent and grossly negligent in allowing outstanding warehouse receipts to exist on said goods and materials which had disappeared.

"3. That the defendant, the Lawrence Warehouse Company, was negligent and grossly negligent in entrusting its warehouse at Ozark, Arkansas, to the custody and the control of one Hoyt Faught, who continued to work for the Ozark Packing Company during the time he had custody and control of said warehouse and who the defendant well knew or had cause to know, lacked the competency to comprehend the nature of his duties and properly perform them in connection with the warehouse activities relating to the Ozark Packing Company.

"4. That the defendant, the Lawrence Warehouse Company, was negligent and grossly negligent in its audits of its warehouse which housed said goods and materials of the Ozark Packing Company to the extent that the financial situation and position of the Ozark Packing Company failed to become apparent.

"5. The plaintiff further states that the defendant, the Lawrence Warehouse Company well knew or had cause to know that said warehouse receipts would be made and were made a part of the financial statements of the Ozark Packing Company and the defendant, the Lawrence Warehouse Company, well knew or reasonably should have known that the Ozark Packing Company intended to exhibit and did exhibit financial statements based on and reflecting as assets said warehouse receipts which did not actually represent goods and materials owned by the Ozark Packing Company and that said financial statements were in fact exhibited to this plaintiff causing the plaintiff to act to its injury in extending credit to the Ozark Packing Company, when the

Ozark Packing Company was in an insolvent condition although shown to be solvent by the aforementioned financial statement.

"6. The plaintiff further states that in reliance upon all of the aforementioned manifestations of financial soundness, this plaintiff continued a course of dealing with the Ozark Packing Company and extended a line of credit to said company, which in the absence of such manifestations, it would never have done; that the continuance of such course of dealing and the extension of such line of credit was the direct result of, proximately caused by and would not have come about but for the aforesaid negligence and gross negligence of the defendant, the Lawrence Warehouse Company.

"The plaintiff further states that the above stated negligence and gross negligence was unknown to the plaintiff and concealed from public knowledge in the internal affairs of the Lawrence Warehouse Company and remained unknown and concealed to this plaintiff and to the public in general until April 21, 1960, when said negligence and gross negligence was revealed to this plaintiff by the discovery depositions of Mr. Hoyt Faught and Miss Marie Evans."

On September 19, 1960, Lawrence filed its answer to the amendment to the complaint in which it specifically denied the allegations contained therein.

On February 28, 1961, after obtaining leave of the court, Lawrence asserted "Additional Defenses" as follows:

"I

"As to the original complaint filed herein, defendant avers and alleges that any and all alleged causes of action, based and founded upon the alleged fraud, and scheme to defraud, on the part of this defendant, are barred by the Statutes of the State of Arkansas, limiting the time within which actions based or founded upon fraud shall be instituted in the State of Arkansas, so that plaintiff is barred from prosecuting this action against this defendant.

"II

"As to Count II of said complaint, defendant avers and alleges that any and all alleged causes of action, based and founded upon the alleged negligence of this defendant, are barred by the Statutes of the State of Arkansas, limiting the time within which action based on negligence shall be instituted in the State of Arkansas, so that plaintiff is barred from prosecuting the alleged cause of action set forth and contained in said Count II as against this defendant."

The case was tried to the court on May 16 and 17, 1961. Prior to the trial, the attorneys for the plaintiff and Lawrence had filed extensive pre-trial briefs, and at the conclusion of the trial the court indicated that it was ready to announce its findings of fact and conclusions of law at that time, but the attorneys for the plaintiff requested time in which to file additional briefs, which time was granted. The case was submitted subject to the filing of briefs in support of the contentions of the respective parties. The post-trial briefs have been received and considered along with the pleadings and all the evidence adduced by the parties, and the court now files this opinion containing the material facts as found by the court, a discussion of such facts and conclusions of law, as authorized by Rule 52(a), Fed.R.Civ.P., 28 U.S.C.A.

At page 20 of its post-trial brief, the plaintiff states its contentions as follows:

"Plaintiff contends simply that as between it and this defendant the loss suffered by Heekin as the result of doing business with the totally insolvent Ozark Packing Company should fall on the defendant Lawrence. This contention is based fundamentally on the proposition as between an innocent party and a party who made possible a fraud which

resulted in injury to the innocent party, the party so assisting the fraud should bear the loss.

"To be more specific, Heekin contends that the customary requirements for recovery in fraud existed in this situation, (1) that a false representation as to the financial condition of the Ozark Packing Company was made to Heekin; (2) that it was made with the knowledge that it was false; (3) that it was made with the intent that Heekin rely upon it and continue to sell cans to the Ozark Packing Company while that company was bankrupt; (4) that Heekin did in fact rely upon this representation of solvency and the continuing concealment of insolvency in extending credit and making credit sales of cans to the Ozark Packing Company; (5) and that such reliance ultimately resulted in the loss of $20,000 to this plaintiff when the Ozark Packing Company finally ceased to do business and it was disclosed that there were no assets whatsoever to satisfy this plaintiff's claim. As is probably apparent from the above discussion of facts, it is plaintiff's further contention that this fraud either (1) was committed with the willful assistance and aid of the defendant, Lawrence, or (2) resulted from complete dereliction of its duties by the defendant Lawrence, or (3) at the very least, was made possible only by the failure of Lawrence to properly staff and maintain the warehouse at Ozark thus giving Kimbrough the means by which to perpetrate the fraud."

The contract between Lawrence and Ozark was entered into at Chicago, Illinois, on August 11, 1950, and provided that Ozark employ Lawrence to establish and operate a field warehouse required in the operation of the business of Ozark, and agreed to lease or cause to be leased to Lawrence "adequate warehouse storage space for all commodities to be warehoused so located and constructed as to secure the proper storing and safety of commodities to be warehoused."

The contract further provided:

"It is mutually agreed that all commodities of like description stored pursuant to this agreement may each be warehoused as one general lot of fungible goods, and that the holder of a warehouse receipt shall be entitled to such portion of each such general lot as the amount of each commodity represented by such receipt bears to the whole of such general lot of such commodity."

Upon the recommendation of Ozark, Hoyt Fay Faught was employed in 1951 by Lawrence as manager or operator of the warehouse. At that time Mr. Faught had been employed by Ozark in various warehouse jobs since 1941. Lawrence required Faught to furnish other references which were contacted by Lawrence, and the references recommended Mr. Faught as being honest and a good worker.

Written instructions were given by Lawrence to its manager, in which Faught was directed, inter alia, to "Keep personal possession of all keys to the warehouse, except such as are delivered by us to our other employees, and make sure that all entrances to the warehouse are securely locked or fastened at all times except when it is necessary for the warehouse to be open to receive or deliver commodities. At all times when the warehouse is open, either you or one or more of our other employees must be present to supervise all movement of commodities in or out."

The instructions further provided:

"Receive commodities for storage and deliver commodities only in accordance with the following instructions and such supplemental instructions as you may receive from us.

\* \* \* \* \* \*

"Receiving Commodities for Storage

"You or one of our other employees will check all commodities re-

ceived at the warehouse and list each item by proper description, showing the date the commodities are received. These lists are to be initialed by the person checking the commodities and are to be retained by you.

"Issuance of Non-Negotiable Warehouse Receipts

"When commodities have been received and safely stored in the warehouse, you are authorized to issue, upon request of the depositor, non-negotiable warehouse receipts in the name of any person or banking institution designated by the depositor.

"You will use only the blank warehouse receipts furnished by us. All data filled in on a warehouse receipt must be in typewriting, using carbon impressions for all copies, except signatures which must be in ink. Warehouse receipts are numbered consecutively and must be issued in that order. In case an error is made in the preparation of a warehouse receipt, mark the original and all copies 'Void' and forward to your operating office keeping for your files the warehouse copy only. Issue a new receipt for the one marked void.

"When the original warehouse receipt and all copies have been completed, the original and Lawrence Warehouse Company office copy signed by you, and the certifications on the reverse side of the Lawrence Warehouse Company office copy have been signed by the depositor and by you, then and only then, you are authorized to and may deliver the original receipt to the depositor, or to the person or bank in whose name the receipt is issued, as requested by the depositor.

"On the same day a warehouse receipt is issued you will mail the Lawrence Warehouse Company office copy to your operating office. You will retain in your stock record binder the warehouse copy of each receipt. The depositor's copy will be delivered to the depositor.

\* \* \* \* \* \*

"You will then post the stack card on or adjacent to the commodities described thereon. Stack cards must remain posted at all times and if one becomes damaged you will at once replace it with a duplicate.

"As commodities are authorized for delivery out of the warehouse, you will show the date and quantity on the stack card.

"If the commodities are moved to another location in the same warehouse, or to another warehouse, or to another unit, move the stack card to the new location. If only part of the goods are moved, make a duplicate stack card and post at or adjacent to the new location.

"Notify your operating office at once when changes of location of commodities in the warehouse or from one warehouse to another, or from one unit to another have been made. Failure to give this notice immediately may affect insurance.

"In all cases you will post stack cards so that you can at all times identify the goods covered by each warehouse receipt."

The instructions given by Lawrence to the manager of the warehouse further provided that when the depositor desired to withdraw commodities from the warehouse, he would deliver a requisition specifying the commodities desired. Such requisition might be a copy of the depositor's selling order or in any other form describing the commodity desired and the number of units. Upon delivery of the commodity to the depositor, he was required to note on the face of the requisition the date and word "Delivered" and then initial the requisition. The manager was required to retain the requisition and file it so that it might be identified with the confirmation of delivery.

The instructions further provided that the manager would obtain the signature

of the depositor to a receipt showing the delivery of the goods either to the depositor or to the purchaser of the goods from the depositor (Ozark).

The remainder of the instructions outlined bookkeeping details of the operations.

It will be noted that the plaintiff in its complaint charged that the defendants (Lawrence, and Kimbrough as president and manager of Ozark) conspired to and did effect a scheme to defraud the creditors and prospective creditors of Ozark (a) by issuing warehouse receipts which were not, in fact, represented by goods received into the warehouse; (b) by releasing from the warehouse goods for which warehouse receipts had been issued and were outstanding without the presentment of said outstanding warehouse receipts; (c) by pledging and hypothecating the spurious warehouse receipts and obtaining therefor cash and credit by which defendants intended to and did maintain and keep in operation Ozark when it was in fact insolvent; (d) by procuring the preparation of and causing the issuance of financial statements of Ozark which reflected the spurious warehouse receipts; (e) by holding Ozark out to the public and to its creditors as a solvent, going concern; (f) by actively concealing the insolvency of Ozark; (g) by utilizing the manifestations of financial soundness to induce persons to extend credit; and (h) by keeping Ozark in business long after said company would, in the normal course of business, have ceased to operate.

The plaintiff, beginning at the bottom of page 5 of its post-trial brief, states:

"There is no indication that fraud was practiced with respect to the issuance of the receipts; it would appear that they were issued only upon the receipt of goods into the warehouse."

This candid admission by plaintiff is entirely justified by the evidence. No evidence was introduced by either party which tended to show that any warehouse receipt was issued for goods not actually deposited, inventoried, classified, stacked and duly identified by proper stack cards.

It should be borne in mind that the receipts that were issued were nonnegotiable. Ark.Stat.Ann., Sec. 68–1204 (1947), defines a nonnegotiable warehouse receipt as follows:

"A receipt in which it is stated that the goods received will be delivered to the depositor, or to any other specified person, is a nonnegotiable receipt."

The contract between Lawrence and Ozark and the instructions of Lawrence to the manager of the warehouse clearly provided for the withdrawal of commodities from the warehouse upon requisition of the depositor, and that the requisition might be a copy of Ozark's selling order. There was a limit placed on the amount of deliveries that might be made upon selling orders, or other requests by Ozark, prior to receiving a confirmation of delivery by Ozark to the purchaser and the payment of the value of the quantity of the commodity so delivered to the holder of the receipt covering the commodity. A period of time was allowed the manager of the warehouse in which to obtain confirmations of such deliveries signed by the warehouse receipt holder, and when those confirmations were received, then the manager was permitted to release further commodities by following the same procedure.

The evidence did not show the number of receipts issued, or the person, firm, or corporation which was named in the receipt as a depositor of the commodity, but from all of the evidence introduced, it seems that the majority, if not all, of the warehouse receipts were issued in the name of someone other than Ozark, to be used by Ozark to secure a loan. Mr. Kimbrough never made any inventory of the commodities for which receipts had been issued, and neither did his auditor make such an inventory. When a receipt was issued, he would prepare a promissory note and take the

receipt and the note to a bank and leave the receipt and note with the bank in return for a deposit of money in the amount that the bank would advance against the merchandise. The banks ordinarily advanced 75 percent of the then market value. When he sold the merchandise, the bank did not surrender the warehouse receipt or receipts, but would merely execute a release and the item would be entered on the record of the bank on the back side of the warehouse receipt, and upon delivery of the release to the warehouse manager, he would enter on his copy of the warehouse receipt the particular release that had been executed by the bank.

It was the custom and the practice of Lawrence to periodically examine the records of the warehouse, and to check the contents of the warehouse in order to determine whether any shortage of commodities, for which receipts had been issued, existed. The examinations were made by trained, capable and competent examiners, may of whom had several years of experience in the work. The reports made by such examiners were introduced in evidence, and disclosed that examinations were made in April 1955 by E. W. Lane; in July 1955 by H. A. Dratfish; in November 1955 by Richard Burke; in April 1956 by C. H. Miller; in September 1956 by R. J. Hudak; and in November 1956 by A. D. Abernathy.

The report of Mr. Abernathy (Deft. Ex. 7) discloses that he made a complete physical inventory of the commodities on deposit; that the records were in good shape and that Ozark had signed receipts for all deliveries. In addition, the report in narrative form, under the word "Inventory," states:

"Records were brought to current status from last IBM and checked against W/Rs and physical; everything tallied exactly. W/M makes an inventory daily, and there is not much chance for a slip-up.

"Physical condition of inventory good; well stacked, no broken cartons and no broken corners, as so often happens when power carrying equipment is being used in aisles.

"Stack cards in place and current balances shown.

"Personnel:

"W/M dependable and knows what he is doing; office help does some of book work.

"An A/W/M [an assistant manager] was discussed with Mr. Kimbrough, and pointed out that if W/M was ill, without an A/W/M the premises would be CLOSED period. W/M has insisted upon a man from the warehouse, or plant, who is reasonably conversant with stock and handling, as against a girl in the office.

"Mr. Kimbrough agreed to discuss the matter with the man proposed (who was not available at the time) and in any case would take necessary steps and send in employment papers on an assistant at once.

"Rating A.
          "/s/ A. D. Abernathy
          "Warehouse Examiner"

In February 1957, Roger P. Carqueville made an examination which disclosed a shortage of $222,020.13. In his report, dated March 21, 1957, he stated: (Pltf. Ex. 6 to Seversen's testimony.)

"Began inventory of this account on the morning of 20 February 1957. Upon my arrival I noted that the plant was not operating and that there was only three or four employees working. This included two girls who were working in the office.

"Upon arriving I met with Mr. B. Kimbrough, and requested that he furnish me with a check in the amount of $911.43. This was to cover some past charges. He flatly stated that he did not have the money and that he had issued us a check that had not cleared the bank. I told him that I wanted that check made good that day and he further

stated that he did not know where he was going to get the money.

"I started to check the records and while doing this I learned that some checks had been issued to cover C/Ds [confirmation of deliveries] which were undoubtedly NSF.

"By about 4:30 that same afternoon I had completed the inventory (case wise) on Lockhart Lowe Foods, Inc. and found the case count to be correct. I had also completed the inventory of the goods held for the City National Bank, Fort Smith, Ark. which came out to some $1,-500.00 short. I had the feeling all that day that the Warehouse was short but this was the first concrete indication that it actually was. I quizzed the W/M about the situation and he stated that he had turned in delivery tickets to Mr. Kimbrough and thought that all commodities that he released had been properly reported. With this information I confronted Mr. Kimbrough, with the W/M present, and told him I wanted to know where said delivery slips were or what happened to them. He stalled for a little while and I finally demanded an explanation. With this he reached in the bottom right hand drawer of his desk and handed me C/Ds that he had been holding back. These C/Ds totaled some $94,000.00 and I still had not completed two of the largest inventories.

"That evening I phoned Mr. Corey after having attempted to contact Mr. Coates and reported the above facts. I also reported that the company had no accounts receivable, no money in any bank account, accounts payable amounting to some $81,-000.00, and about $11,000.00 worth of bad checks being held by several banks. Later I spoke to Mr. Coates and reported this information directly to him, with the request that one of my superiors be sent down immediately.

"The following day I completed the inventory and it was determined at that time that the shortage amounted to the reported figure of $222,020.13. At this point I awaited the arrival of Mr. K. L. Seversen.

For further information please refer to Mr. C. O. Butler or Mr. K. L. Seversen.

"/s/ Roger P. Carqueville"

Following the report of Examiner Carqueville, Lawrence employed a certified public accountant, George V. Rountree & Co., of 845 North Ridgeland Avenue, Oak Park, Illinois, to examine and audit the records of Ozark. Mr. Rountree and associates worked for approximately two weeks in the office of Ozark in an effort to ascertain the status of its affairs. He examined all the records of Ozark that were available. He testified without contradiction, and the court finds that the following is true:

"The accounting records were very poorly maintained. We could not rely on the beginning inventory, the accounts receivable nor the accounts payable.

"We do not call this an audit report. It is merely an audit investigation. We did not certify to it."

In the letter transmitting the report, he stated:

"Because of inadequate accounting methods and records as well as time limitation, it was not practical to apply all of the generally accepted auditing procedures. We directed our efforts principally to recording the company's assets and liabilities as at April 30, 1957, and November 30, 1956. We also made some adjustments to the balance sheet at November 30, 1955, which came to our attention during the examination.

"In view of the uncertainties as to the accounting periods in which the transactions arose and the possibility of omitted transactions, we are unable to express an opinion as to

the fairness of the financial position of Ozark Packing Company at April 30, 1957, and November 30, 1956, and the results of operations since December 1, 1955. However, we expect the financial data and comments in this report can be relied upon as the basis for determining future action to be taken."

He further testified:

"We did not have enough records to satisfy ourselves as to the financial condition. We are governed by the rules and regulations of the American Institute of Accountants generally, and we are not permitted to certify to the financial condition of a company or any other business unless we have done certain things, in general satisfied ourselves as to the reasonableness of the assets and that all of the liabilities are recorded. For example, we are not supposed to certify without exception unless we circularize the accounts receivable and make physical test checks of the inventory, which we did not do. But these records are so hopeless that we wouldn't dare certify to them."

In his testimony Mr. Rountree was asked the following question by the attorney for plaintiff:

"Now, Mr. Rountree, you understand, I believe, that our primary concern here is the existence of a shortage at the Ozark Packing Company prior to the time that the whole thing blew up in February of 1957. Now let me ask you this: From your investigation of the circumstances and from your professional knowledge, would it be possible for you to say with any degree of accuracy when the shortage began to appear at the Ozark Packing Company?"

To which the witness answered: "I don't think so."

In his report he listed the indebtedness of Ozark and the names and the amounts due various creditors, evidenced by promissory notes and secured as indicated below:

Secured by Warehouse Receipts

| | |
|---|---|
| First National Bank, Ft. Smith, Ark. | $173,712.26 |
| City National Bank, Ft. Smith, Ark. | 62,331.75 |
| American State Bank, Charleston, Ark. | 14,786.25 |
| City National Bank & Trust Co., Kansas City, Mo. | 43,643.48 |
| Bank of Ozark, Ozark, Ark. | 800.00 |
| Lockhart-Lowe Foods, Inc. | 4,242.75 |

Secured by Assigned Customer Accounts

| | |
|---|---|
| First National Bank, Ft. Smith, Ark. | $ 6,660.05 |
| City National Bank, Ft. Smith, Ark. | 37,725.05 |
| American State Bank, Charleston, Ark. | 1,176.23 |

Secured by Mortgages

| | |
|---|---|
| City National Bank, Ft. Smith, Ark., RFC loan | $ 60,278.05 |
| City National Bank, Ft. Smith, Ark. | 8,307.18 |

Secured by Unearned Premiums on Stock Insurance Policies

| | |
|---|---|
| Union National Bank, Little Rock, Ark. | $ 968.16 |
| Total | $414,631.21 |

No warehouse receipts were executed by anyone other than the manager, Hoyt Fay Faught, who was the sole employee of Lawrence, and it is admitted by plaintiff that there is no testimony tending to show that the commodities covered by each receipt were not in fact deposited at the time the receipt was issued.

Mr. Kimbrough would not undertake to state how the shortage occurred, and in fact in response to the question, "Can you explain how your financial picture changed from the last audit report of November 30, 1955, until you went out of business in January of 1957?", answered, "No, I can't actually pinpoint

the real cause for the difference in my financial structure at that time."

That a shortage did develop is not disputed, but there is no evidence to show when the shortage occurred or how it occurred, and the court finds that the most plausible explanation of what happened is found in the report of Examiner Carqueville and in the testimony of Mr. Rountree, hereinbefore set forth.

The plaintiff introduced, over the objections of the defendant, audit reports of Ozark purportedly made by Douglas Walker & Co., certified public accountants. The first report (Exhibit 1 to the deposition of Kimbrough) is as of November 30, 1952. The second report (Exhibit 2 to Kimbrough's testimony) is as of November 30, 1954. The third report (Exhibit 3 to the testimony of Kimbrough) is as of November 30, 1955.

The second report, as of November 30, 1954 (Exhibit 2), was also introduced as plaintiff's Exhibit 2 to the testimony of W. J. Hoye, and the report as of November 30, 1955, was introduced by plaintiff as Exhibit 1 to the testimony of W. J. Hoye. Neither Mr. Walker nor any of his employees appeared to testify concerning the reports, but in each report the following statement is made:

"Auditing tests and checks on accounts and records concerning accounts receivable and inventories have been made, but we have not applied the generally accepted auditing procedures of direct communication with debtors or attendance at the physical count of inventory nor have physical tests of inventories been made under our observation."

The reports do not purport to be anything other than a check or examination of the "books and records of the Ozark Packing Company," and merely reflect what such records show, but the records of Ozark were not only inaccurate but appear to have been fraudulent.

Upon receipt of the report of George V. Rountree & Co., Lawrence sent Mr. K. L. Seversen, who undertook to liquidate the affairs of the warehouse. Mr. Seversen succeeded in realizing from the commodities on deposit the sum of $165,-291.73, which, after payment of necessary expenses, left the sum of $158.808.-00, which it paid to the creditors of Ozark that held warehouse receipts, and after using such funds to reduce the indebtedness, paid in full the balance remaining due the holders of the warehouse receipts.

▮ The court, immediately before beginning to set forth its findings of facts, copied in toto the contentions of the plaintiff as stated in its post-trial brief. In its argument the plaintiff contends that the defendant Lawrence was guilty of actionable fraud, and that the essential ingredients of an action founded on fraud are present. It states that the ingredients are:

"(1) A false representation by the defendant [Lawrence],

"(2) *Scienter*, the knowledge of the defendant [Lawrence] that his representation is in fact false,

"(3) Intent of the defendant [Lawrence] that another rely upon his false representation,

"(4) Reasonable reliance upon such representation by another,

"(5) Resulting damage to such other person from his reliance."

In support of its argument the plaintiff cites and relies upon the case of Stewart v. Clark, 1938, 195 Ark. 943, at page 949, 115 S.W.2d 887, at page 890, in which the court said:

" 'Persons, in order to be guilty of legal or constructive fraud, or, as it is sometimes called, fraud at law, do not necessarily have to be guilty of moral wrong, but a constructive fraud is a breach of either legal or equitable duty which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or injure public interests. Neither actual dishonesty of purpose nor intent to deceive, is an essential ele-

ment of constructive fraud.' 26 C.J. 1061, and cases cited."

The plaintiff also relies upon the principle approved in the case of Stewart v. Hedrick, 1943, 205 Ark. 1063, at page 1068, 172 S.W.2d 416, at page 418, where the court said:

"* * * The law applicable to the case was stated in the opinion in Wilson v. Davis, 138 Ark. 111, 211 S.W. 152, where it was said that a conspiracy may be inferred although no actual meeting of the parties is proved, if it be shown that two or more persons pursued by their acts the same unlawful purpose, each doing a part, so that their acts, though apparently independent, were in fact connected; and that when such an unlawful agreement is entered into, the parties become liable as joint tortfeasors to the extent of the damage done as a result of the conspiracy, and the liability of a particular conspirator does not depend upon the extent to which he profited nor his activity in promoting the conspiracy."

The principles set forth in the above quotations are well established by various decisions of the Arkansas Supreme Court and are applicable in a proper case, but in view of the facts in the instant case the court is not entitled to apply either of them to sustain the contentions of the plaintiff. As heretofore shown, the agreement between the defendant Lawrence and Ozark was that Lawrence would issue its standard nonnegotiable warehouse receipts to such persons, firms or corporations as would be designated by Ozark covering the commodities in defendant's custody and control, consisting largely of canned and cased vegetables. The holders of the warehouse receipts were to be banks in the main, such as the City National Bank and the First National Bank of Fort Smith, Arkansas, and also other banks and institutions. The banks made loans or advances to Ozark, to secure which, the nonnegotiable warehouse receipts were issued, at the request of Ozark, on goods

and commodities in the custody of Lawrence. Likewise, similar receipts were issued to the American Can Company and the Continental Can Company, who supplied cans and covers to Ozark. Receipts were issued to suppliers of vegetables and commodities to be canned by Ozark.

For some reason best known to the plaintiff, it decided to extend an open line of credit to Ozark for all cans supplied from time to time without demanding or securing warehouse receipts. Presumably the plaintiff elected to deal with Ozark on such a basis in order to meet competition. The purpose of the whole arrangement was to enable Ozark to finance its operations.

In Bradley v. St. Louis Terminal Warehouse Co., 8 Cir., 1951, 189 F.2d 818, at page 823, the court, speaking through Circuit Judge Riddick, said:

"Field warehousing is a term applied to an arrangement whereby a wholesaler or manufacturer finances his business through the pledge of goods remaining on his premises. The arrangement is valid and effective where there is an actual delivery to the warehouseman as bailee who for hire takes and maintains open, visible and exclusive possession of the warehouse goods. The leading case in the Federal courts sustaining the validity of such transactions is Union Trust Co. v. Wilson, 198 U.S. 530, 25 S.Ct. 766, 49 L.Ed. 1154, followed in Heffron v. Bank of America, 9 Cir., 113 F.2d 239, annotated in 133 A.L.R. at p. 209, where the decisions of many jurisdictions are collected."

In addition to the cases cited by Judge Riddick, see Pittman v. Union Planters National Bank & Trust Co., 6 Cir., 1941, 118 F.2d 211; Ribaudo v. Citizens National Bank of Orlando, 5 Cir., 1958, 261 F.2d 929.

These and other cases recognize that all of the companies engaged in the field warehousing business normally employ as custodian or warehouse manager a

competent person in the employ of the depositor familiar with the type of commodity warehoused, so that proper control and supervision may be maintained. Invariably, the wages to be paid such individual by the warehouse company are transmitted to the field warehouse company by the depositor, and are then sent to the employee by the warehouse company. Thus, the depositor assumes no additional expense in the operation of its business. Such was the case here with the manager, Faught. See Philadelphia Warehouse Co. v. Winchester et al., C.C.Del.1907, 156 F. 600.

The plaintiff has further argued that since the manager, Faught, was a man of no great learning or ability, that he was utterly without qualifications to supervise or run an independent, complicated operation without turning to his former boss, Ozark, for instructions. The plaintiff, in making such argument, overlooks the fact that Kimbrough, the president and manager of Ozark, highly recommended Faught for selection as a manager, and after receiving that recommendation, the defendant Lawrence made other inquiries, and all the references recommended Faught as a man of experience in that line of work and all said he was honest and reliable.

In 57 C.J.S. Master and Servant § 559, p. 270, it is stated:

"A master may be liable for injuries inflicted on a third person by his servant where he was guilty of negligence in selecting a servant incompetent or otherwise unfit to perform the services for which he was employed, * * *. The servant's incapacity must relate to the duties required of him, but it is not essential that the precise injury * * which did occur could have been anticipated or foreseen, and it will be sufficient that the injury resulting therefrom is such as is usual and therefor might have been expected.

"The master, in selecting an employee, must exercise a degree of care commensurate with * * * the nature and grade of service for which the servant is intended, but is required to hire employees possessing only such skill as is ordinarily and reasonably commensurate with the work to be performed by them."

In view of the recommendation of Faught by Ozark, and the knowledge that the employees of plaintiff had of Faught and of the entire operation, it appears inconsistent that the plaintiff should now contend that Faught did not have the ability to manage the warehouse, especially in view of the fact that it admits that Faught did not fraudulently issue any receipts.

The plaintiff further contends that this man, lacking ability and ordinary intelligence, conspired with Kimbrough to commit a fraud on the plaintiff. Yet if he was so deficient in ability, as now contended by plaintiff, it would seem improbable that he had the ability to conspire with Kimbrough to injure the plaintiff.

It appears from the testimony of W. J. Hoye, sales manager of plaintiff, that the plaintiff began selling to Ozark on credit in June 1952. In 1956 the amount of the credit was increased to $17,500, and it should be remembered that in November 1956, Examiner A. D. Abernathy reported that he had made a complete physical inventory of the commodities on deposit; that the records were in good shape; and that Ozark had signed receipts for all deliveries. In other words, as late as November 1956 there was no shortage in the warehouse according to the uncontradicted evidence. Evidently the operation was successfully conducted until serious trouble arose early in 1957 when in February the examination of Examiner Roger P. Carqueville disclosed a serious shortage which resulted in the closing of the warehouse and the liquidation of Ozark. The examination of Carqueville was followed by an independent examination of Ozark by George V. Rountree & Co., and that examination disclosed that the books and records of Ozark were entirely unreliable. Yet the plaintiff contends that it relied upon the

audits made by Douglas Walker & Co., but, as heretofore shown, the audits of Douglas Walker & Co., revealed that they had not applied the generally accepted auditing procedures of direct communication with debtors, and did not attend at the physical count of inventory nor were physical tests of inventories made under their supervision. They accepted at face value the entries in the books and records of Ozark.

In fact and in truth, the plaintiff simply desired to sell cans and covers for the commodities that were being packed by Ozark. They were in competition with other manufacturers of cans and covers, and in order to meet that competition began selling to Ozark upon credit. As for that matter, many others sold goods and commodities to Ozark upon credit, and when Ozark was liquidated found themselves unable to collect the amounts due. When the judgment obtained by plaintiff against Ozark was found to be uncollectible, this suit was brought and the plaintiff, in an effort to fasten liability upon Lawrence, now contends that the employee of Lawrence entered into a fraudulent scheme to defraud it and other unsecured creditors.

The proof does not establish fraud on the part of Lawrence or its employee, and certainly the defendant Lawrence had no control over or of the making of the records of Ozark.

George V. Rountree & Co., after their examination of the records of Ozark, stated that "The accounting records were very poorly maintained. We could not rely on the beginning inventory, the accounts receivable nor the accounts payable." Also, Examiner Carqueville stated that when he confronted Kimbrough with the facts as disclosed by his examination and demanded to know where certain delivery slips were, or what happened to them, that "He stalled for a little while and I finally demanded an explanation. With this he reached in the bottom right hand drawer of his desk and handed me C/Ds that he had been holding back. These C/Ds totaled some $94,000.00 and

I still had not completed two of the largest inventories."

The record before the court is not sufficient for the court to determine what happened between November 1956 and February 1957. The court does know from the record before it that during that interval the shortage developed, but the defendant Lawrence had nothing to do with the shortage. There was no change in the management of the warehouse by Faught, and it is highly improbable that anyone except Kimbrough will ever be able to determine precisely just what happened, or what he did with the money that he supposedly received for goods and commodities withdrawn upon selling orders between November 1956 and sometime in February 1957. Indeed, he testified that he could not "actually pinpoint the real cause for the difference in my financial structure at that time." Regardless of what Kimbrough, as the manager of Ozark, did, the record is completely devoid of any testimony to establish fraud on the part of Lawrence or its employee, Faught.

In Ellis v. Ellis, 1952, 220 Ark. 639, at page 642, 249 S.W.2d 302, at page 304, the court said:

"We said in Biddle v. Biddle, 206 Ark. 623, 177 S.W.2d 32, 35: 'There is no rule more firmly established than the one that fraud will not be presumed, and the burden is on the party alleging it to prove it by preponderance of the evidence which is clear and convincing.'

"We reaffirmed this rule in the more recent cases of Barnett v. Morris, 207 Ark. 761, 182 S.W.2d 765; Eaton v. Humphreys, 209 Ark. 525, 190 S.W.2d 973; McHenry v. McHenry, 209 Ark. 977, 193 S.W.2d 321."

The court cannot indulge in inferences to supply facts necessary to fasten liability upon Lawrence. In Fort Smith Gas Co. v. Blankenship, 1937, 193 Ark. 718, at page 721, 102 S.W.2d 75, at page 76, the court said:

"The indulgence of inferences will not supply a nonexistent fact. In-

ferences to support a verdict arise out of facts established by evidence. Other inferences are purely speculative, or maybe guesswork or conjecture. This method of dealing with the rights of parties has been condemned by many decisions. Standard Pipe Line Co. v. Burnett, 188 Ark. 491, 66 S.W.2d 637; St. Louis, I. M. & S. Ry. Co. v. Hempfling, 107 Ark. 476, 156 S.W. 171; Denton v. Mammoth Spring E. L. & P. Co., 105 Ark. 161, 150 S.W. 572; Ft. Smith Light & Traction Co. v. Cooper, 170 Ark. 286, 280 S.W. 990; Turner v. Hot Springs Street Ry. Co., 189 Ark. 894, 75 S.W.2d 675; Lewis v. Jackson, 191 Ark. 102, 83 S.W.2d 69.

"A consideration of the sound principles announced in the above-cited cases and of many other similar authorities impels us to hold the court erred in failing to direct a verdict for the defendant upon this matter."

In Oklahoma Tire & Supply Co. v. Williams, 8 Cir., 1950, 181 F.2d 675, at page 679, the court said:

"The law applicable to the case was the law of Arkansas, but consideration of the Arkansas cases relied on by the court and cited to us fully confirm the law of that state to be, as stated by the trial court, that a finding can not be predicated upon conjecture and speculation and that inferences to support a finding must arise out of facts established by evidence."

The plaintiff also contends that the defendant Lawrence, through its employee Faught, was negligent and that such negligence was the proximate cause of the shortage and the loss to it, but the plaintiff never at any time had any lien upon any of the goods and commodities in the warehouse or for that matter in the possession of Ozark. Again, the evidence does not establish negligence on the part of the defendant Lawrence which proximately caused the loss that has been suffered by plaintiff.

The testimony of the sales manager of plaintiff discloses that from 1952 to the closing of the business he and the manager of Ozark, Kimbrough, were friendly, and there is no question in the mind of the court that the sales manager of plaintiff relied entirely upon the representations made by Kimbrough in extending the credit and even increasing the credit from time to time.

The conclusion reached by the court makes it unnecessary to consider the additional defenses asserted by Lawrence in the amendment of February 28, 1961, to the original answer.

The plaintiff has failed to establish that its loss was proximately caused by any act or omission on the part of the defendant Lawrence, or that Lawrence aided and abetted Ozark in the perpetration of a fraud upon the plaintiff.

Therefore a judgment is being entered today dismissing the complaint and the amendment thereto, and adjudging the costs against plaintiff.